HARRY R. KETCHUM, Plaintiff-Appellant, v. DURA-BOND CONCRETE, INC., *et al.*, Defendants-Appellees.

Second District   No. 2—88—0371

Opinion filed February 24, 1989.

Madsen, Baudin, Stolfi & Sugden, of Crystal Lake (W. Randal Baudin, of counsel), for appellant.

Esther Joy Schwartz and Helen Wong Mehok, both of Orner & Wasserman, Ltd., of Chicago, for appellee Dorothy E. Curran.

Vette E. Kell, of Kell, Nuelle & Loizzo, of Woodstock, for other appellees.

JUSTICE WOODWARD delivered the opinion of the court:

This case arises out of two collisions involving three vehicles occurring on Route 14 in Crystal Lake, Illinois, on Sunday, October 14, 1984, at approximately 9:50 a.m. Plaintiff, Harry Ketchum, appeals from the trial court's granting of defendants' motions for directed verdicts.

Plaintiff sued Dorothy Curran (Curran), Douglas Daugherty (Daugherty), Dura-Bond Concrete, Inc. (Dura-Bond), and Russell Keck (Keck), for damages arising out of the accident. Plaintiff sued Dura-Bond, Daugherty's employer, under the theory of *respondeat superior*. Prior to the jury trial, plaintiff settled with defendant Keck. At trial, after plaintiff concluded his case, the trial court granted defendant Curran's motion for a directed verdict. The court denied motions by defendants Daugherty and Dura-Bond for directed verdicts.

Daugherty and Dura-Bond did not present any testimony but offered photographs into evidence. Plaintiff offered no rebuttal. At the trial's conclusion, Daugherty and Dura-Bond renewed their motions for directed verdicts, which were again denied by the trial court. After 11 hours of deliberation, the jury informed the trial court it was unable to reach a verdict; the court declared a mistrial.

A motion to reconsider the court's denial of Daugherty's and Dura-Bond's motions for a directed verdict was granted by the trial court on February 24, 1988. At that time, the court also reconfirmed its granting of Curran's motion for a directed verdict and entered judgment on her behalf.

On March 21, 1988, the trial court entered an order directing verdicts on behalf of Daugherty, Dura-Bond, and Curran. This appeal followed.

On appeal, plaintiff argues that (1) the trial court erred in granting defendant's motions for a directed verdict; and (2) the trial court erred in not permitting plaintiff to present expert testimony.

OFFICER THOMAS KOUKALIK'S TESTIMONY

Officer Thomas Koukalik testified that on the date of the accident, he was a patrolman for the Crystal Lake police department. He was sent to the accident scene to investigate. At the time of the trial, he

served as a police officer for the University of Arizona police department at Tucson, a position he had held since 1985. The witness had been a police officer for the City of East Dundee for approximately 2½ years before joining the Crystal Lake police department, in which he had served for a period of 5½ years. The witness had junior college level training in law enforcement, and he had attended evidence technician and accident investigation schools. He also had been a member of the emergency services team in Crystal Lake.

Officer Koukalik described Route 14 as a four-lane, asphalt highway, divided into two northeasterly and southwesterly lanes, which were separated in the center by a yellow line. (We note that the other witnesses generally referred to Route 14 as going in an east-west direction.) The entire width of the roadway from the northern border to the southern border was slightly in excess of 28 feet. At the time of the accident, weather conditions were clear, and it was not raining. The pavement was generally dry with some wet patches.

At the accident scene, Officer Koukalik measured the skid marks attributed to Keck's vehicle to be 34 feet 2 inches in length. The skid marks went in straight lines, entirely within the lane nearest the center line for westbound traffic. These were the only skid marks indicated on the roadway surface that morning. Specifically, he indicated that there were no skid marks or yaw marks found on the roadway attributable to the Daugherty van.

At the accident scene, Officer Koukalik talked to Keck, who said that he had been traveling at the speed limit of 35 miles per hour along Route 14 in a westerly direction. Keck stated that he had been "in no particular hurry," when his attention was "diverted momentarily" away from the road in front of him. When he had glanced back, he noticed that the vehicle (the Daugherty van) in front of him "had its brake lights on, and it was slowing." Keck also stated to him that he had applied his brakes after seeing Daugherty's brake lights and slid into the rear end of the Daugherty van.

Officer Koukalik spoke to Daugherty, who stated that he was traveling westbound along Route 14, when he observed a vehicle (Curran's) in front of him, "either slowing or stopping or attempting a left-hand turn into the driveway of Montgomery Wards," and that as a result, he started to slow his van, to avoid hitting her. Daugherty then stated that he was struck from behind by another vehicle (Keck's) "and was pushed forward slightly."

Officer Koukalik testified that Daugherty had not told him that Keck had struck him at the speed of 50 miles an hour, nor did he tell him that Curran had cut him off. In an offer of proof, Officer Koukalik

related what Curran had said to him in a telephone interview several hours after the accident.

Curran stated that she was in the inside lane (heading westbound) on Route 14 and had slowed down to make a left-hand turn at the Montgomery Ward store. Her turn signal was on. She heard the squealing of rubber or tires and looked up in her rearview mirror and saw a van approaching her car "from the rear at what she thought was a high rate of speed." She took "an evasive action and quickly accelerated and turned her wheel to the right to get out of the path of that vehicle [the van]."

She managed to get out of the path of the van, and from her "side vision" she saw the van "go past her side and be involved in a motor vehicle accident."

On cross-examination, Officer Koukalik stated that Keck told him that he knew his vehicle would strike Daugherty's van. Keck also stated to him that during the collision, the van was pushed over the center line. Daugherty told Officer Koukalik that just prior to coming to a stop, his van was rear-ended by another vehicle and pushed forward at an angle across the center line.

PLAINTIFF HARRY KETCHUM'S TESTIMONY

At about 9 a.m. on October 14, 1984, plaintiff ate breakfast with his cousin, Daniel Shrove, at the Lakeview Restaurant on Route 14 in Crystal Lake. (Mr. Shrove was killed in the accident.) At approximately 9:30 a.m., they left the restaurant and drove in an easterly direction along Route 14, their destination being a bull farm located on Route 14 in Crystal Lake. In addition to working his own farm, plaintiff had worked at the bull farm since approximately 1961 in barter for hay.

Plaintiff sat in the front passenger seat as Daniel Shrove drove his 1971 red Volkswagen Beetle (Volkswagen). Their car was in the curb lane as it passed through the intersection of Route 14 and Virginia Road just west of the Montgomery Ward store in Crystal Lake. The speed limit in the area was 35 miles an hour, and their vehicle was traveling at that speed.

As they traveled, plaintiff had been "relaxing, practically asleep," when he heard a horn, and looked up to see two vans coming toward the Volkswagen. The next thing he remembered was "what felt like bouncing over a curb, and that was it."

Plaintiff regained consciousness while being treated at the emergency room of the Northern Illinois Medical Center in McHenry, Illinois, where he received treatment for a period of several months.

DEFENDANT DOROTHY CURRAN'S TESTIMONY

Curran left her home that morning in Orland Park to attend her niece's birthday party in McHenry County and had turned left, or westbound, from Route 31 onto Route 14, to drive to the Montgomery Ward store to buy her niece a present.

The weather was overcast, and the streets in Crystal Lake were damp. Curran said that it was not raining at the time, and, consequently, neither her headlights nor windshield wipers were activated. The pavement was "damp and dry in patches."

The witness turned onto Route 14 and immediately entered the inside lane. Her speed was 30 miles per hour until she reached the vicinity of Montgomery Ward, where she executed her left-hand turn signal, about 100 feet from the parking lot entrance. She came to a stop opposite the entrance in "a very regular, normal, slow stop." She did not skid or come to an abrupt stop. She waited "20 to 30 seconds" for oncoming, *i.e.*, eastbound, traffic along Route 14 to clear. As the witness was waiting to turn, she "heard some screeching from behind, as in tires on pavement and *** looked in [her] rearview mirror, and saw the van [*i.e.*, the van driven by Daugherty] coming up behind [her]." Upon hearing the screeching and looking into her rearview mirror, Curran thought the van was about "20 to 30 feet behind her."

Curran could not testify as to the exact speed of the van when she first saw it because she was "more intent in getting [her] car out of the way." She stated that "it was moving sufficiently fast that I felt that the person could not stop, and I had to move out of the way in order to avoid a collision."

Accordingly, Curran accelerated and "tried to move my car as quickly as I could, and I checked the right view mirror to see if there was somebody coming up in the outside lane, and there was not, so I proceeded to go a little bit into that lane." The witness moved her car "just a couple of feet over into the curb lane area." There was no contact between the two vehicles.

As she was maneuvering her vehicle, Curran took a quick glance in her left side mirror and observed that the van "had already gone into the oncoming traffic." She did not see the impact between the van and the Volkswagen in which plaintiff was riding, because she had redirected her attention to driving her own car.

The witness eventually made her way into the John Evans restaurant parking lot adjacent to the Ward's parking lot and parked her car. From there she saw the Volkswagen resting in approximately the center of the Wards' driveway facing in a southeasterly direction, about 5 or 10 feet back from Route 14.

The van came to rest facing in an east to southeast direction up against the curb area of the driveway. At the accident scene, she saw plaintiff, who was "half out of the V.W. His head was on the pavement. His head was bleeding." Neither Daugherty nor Keck appeared to have been hurt in the accident.

On cross-examination, Curran admitted that she did not know which vehicle behind her was screeching its tires. Also, she heard only one impact.

DEFENDANT DOUGLAS DAUGHERTY'S TESTIMONY

On the date of the incident, Daugherty was employed by Dura-Bond, which structurally restored bridges, parking structures, dams, and sewers. In the course of his employment, Daugherty was provided by the company with a 1981 three-quarter ton Chevy, Series 20 van, which on the relevant date had traveled approximately 99,000 miles.

Daugherty testified that he was 6 feet 4 inches tall, weighed 230 pounds, and was color blind. At the time of the incident, he was not wearing a seat belt.

On the morning of Sunday, October 14, 1984, Daugherty went to "The Keep," a storage facility in Crystal Lake, to pick up work materials which he was going to use the following day. Daugherty loaded approximately 1,800 pounds of materials into the van before he left "The Keep."

After loading the van, Daugherty drove the vehicle on Teckler Boulevard and turned left onto Route 14 heading in a westerly direction. The van was traveling in the inside lane. It was drizzling and overcast, and he was operating the van with its windshield wipers and headlights activated. The fastest speed he traveled was "25 to 30 miles an hour."

Daugherty initially said that he first saw Curran's car when her vehicle was entering the inside lane approximately 800 feet ahead of him. Curran gave one signal flash and came into the inside lane. At that time, he was traveling 25 miles per hour, and "she was doing the speed limit, 35 miles an hour."

When Curran changed lanes, he began to slow down, because "I am a cautious driver. If somebody gives me a one signal flash and comes into my lane, I take it as I don't know what is coming next."

Daugherty then altered his testimony, stating that after Curran signaled once and entered his lane, the distance between the two vehicles was 300 feet. Daugherty then stated that when coming to a stop behind Curran's vehicle, he pumped his brakes three times in a 70-foot interval and then took another 80 feet to come to a stop, *i.e.*, 150 feet

to stop his vehicle. Plaintiff's attorney impeached this testimony with Dautherty's deposition testimony that the interval in which his vehicle came to a stop was 300 feet.

While following Curran's car, Daugherty pumped his brakes three times, "to slow my vehicle down," diminishing his speed "from 25 miles an hour to 15 miles an hour." Daugherty first noticed Curran's brake lights were activated when they were at a distance of 300 feet apart. However, plaintiff's attorney impeached this testimony with Daugherty's deposition testimony that the distance was only four car lengths, or about 80 feet.

At the time he was pumping his brakes, Curran's vehicle came to "an abrupt stop." He did not recall seeing Curran's left rear turn signal flashing. Curran's braking was "hard enough to make [Curran's] car dive. No, not skid, no squeals, but enough to put the nose of that car down to stop." Plaintiff's attorney impeached this testimony with Daugherty's deposition testimony that Curran skidded when she had applied her brakes.

Daugherty never saw Curran move her vehicle from the center lane to the curb lane. Plaintiff's attorney impeached this testimony with Daugherty's deposition testimony that he had seen Curran "cut back into the lane nearest the curb."

At the time Curran moved out of his way, Daugherty stated that he was traveling at five miles an hour, but it would have taken him at least five more seconds to avoid colliding with the rear of Curran's car. He admitted that had Curran not pulled away, he would have "tapped her." At this time, Daugherty's van was struck from behind by the vehicle driven by Keck.

Daugherty did not see Keck's vehicle prior to being struck by it. At the time of the collision with the Keck vehicle, both of Daugherty's hands were on the steering wheel, and his van was "heading straight" down Route 14 in a westerly direction. He was hit at what he estimated to be a speed of 50 miles per hour. The van was propelled by the impact with Keck's vehicle, "across the center line," and "across the one lane of traffic nearest the center line for eastbound traffic," and "hit off center and [was] just a projectile into that Volkswagen." The impact caused by Keck's vehicle hitting his van was "harder" than the impact sustained by the van when it hit the Volkswagen.

Upon impact, Daugherty's hands left the steering wheel, and it bent towards him. Also, his seat was bent backwards. Daugherty did not believe the seat could have been bent as a result of the collision between the van and the Volkswagen.

Daugherty stated that he had not flipped over his seat and ended

up in the back of the van. Plaintiff's attorney impeached this testimony by reading Daugherty's deposition testimony into the record.

"Q. And, when you say you were knocked to the floor, you mean you actually bent back with your seat?

A. I bent the seat right back and flipped over it.

Q. You flipped over the seat?

A. Flipped over the seat and landed on the floor behind it."

Daugherty ended up on his backside on the floor of the van after he had been hit by Keck. As he attempted to regain his position, he was unable to get his hands back on the steering wheel before the van hit the Volkswagen.

Daugherty acknowledged that prior to the second collision, the Volkswagen had been in the eastbound curb lane and that there was nothing unusual about its travel or speed, which he approximated to be about 30 to 35 miles an hour.

Daugherty was not injured in either of the collisions, but immediately following the accident, he was "extremely disoriented." He admitted that he did not tell Officer Koukalik that Curran had cut him off or that Keck had hit him at 50 miles per hour.

RUSSELL KECK'S TESTIMONY

Keck testified that on October 14, 1984, he had worked all night at the McDonald's in Crystal Lake and left work that morning at 9:30 a.m. to go to his parents' house in Lake in the Hills, where he lived. He was driving a 1979 Chevrolet Suburban vehicle and traveling westerly along Route 14. He was not wearing a seat belt at the time of the occurrence. The highway was comprised of four lanes, two in each direction, with the center being divided by two yellow lines; he traveled in the lane nearest the center line. It was not raining. As he drove along Route 14, he noticed the van driven by Daugherty, approximately 75 to 85 feet ahead of him. The speed limit was 35 miles an hour. He estimated his speed at the time and that of Daugherty's van to be 30 to 35 miles per hour. For an unspecified distance, he maintained that same 75- to 85-foot interval.

Keck took his eyes off the roadway in front of him for "not more than a second," to check the surrounding area. When his eyes returned to the roadway, he noticed that Daugherty's brake lights were on. At that time, he was "maybe 60 to 70 feet" behind Daugherty.

When he saw the brake lights, Keck "immediately applied [his] brakes." At that time, he was traveling 30 to 35 miles an hour. He did not know why the van was stopping. Keck had not seen Curran's car ahead of Daugherty's van. Keck did not hear the van's tires screech

when he saw the brake lights appear, nor did he see the van skid. He first applied his brake lights, and, "when I saw I wasn't going to stop in time, I stepped on them hard and I skidded into the rear of the van." He acknowledged leaving skid marks at the scene of the accident. The impact with the van was "not very hard." At the time of impact, his vehicle was traveling "about 10 to 15 miles an hour," and the van was traveling at 5 to 10 miles an hour." At the time of impact, he was "straight behind it [the van]." He said that he did not hit the van "with such force that it caused it to fly across the center line." Nor did he hit it with such force that the van should have crossed over the center line into oncoming traffic.

After his contact with the van, Keck's vehicle "stopped right there." Keck was not injured in the collision, and he never sought any medical attention.

After it was hit, the van appeared to turn across the center line at a "kind of sharp" angle—approximately 75° to 80°. He observed the Volkswagen in the eastbound curb lane just before it was hit by Daugherty. There was nothing unusual about its position or speed.

At the time the van hit the Volkswagen, the van's speed was 10 to 15 miles an hour. He saw the left of the van strike the left of the Volkswagen. At impact, the Volkswagen was pushed sideways into the Wards parking lot, and the rear of the van swung around in a counterclockwise direction.

After the collision, Keck got out of his vehicle without the need of assistance and observed the plaintiff, half in and half out of his car, "unconscious and bleeding."

On cross-examination, Keck stated that "when he first noticed [the van], it was almost to a stop. That's when I first saw it, almost to a stop." At the point of impact, the van was pointed straight ahead. Keck was still applying his brakes at impact. The left front of Keck's vehicle struck the left rear portion of the van. As a result of this collision, the radiator of Keck's vehicle was punctured, and the grill was damaged.

■ Plaintiff initially argues that the trial court erred in granting Daugherty's and Dura-Bond's motions for directed verdicts. The standard used in determining whether or not to grant a motion for a directed verdict is found in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494.

> "In our judgment verdicts ought to be directed *** only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could

ever stand." *Pedrick*, 37 Ill. 2d at 510.

■ Plaintiff contends that the trial testimony contains such blatant disparities that, under *Pedrick*, the directed verdicts in Daugherty's and Dura-Bond's favor cannot stand. We agree. A careful review of the evidence demonstrates that there is no clear picture of what exactly occurred before and during the two collisions. On virtually all important points, the evidence is contradictory and confusing.

In determining this first issue, the testimony of Keck and Daugherty is of critical importance. They are the only two witnesses who spoke directly to how the collisions occurred.

Daugherty testified that at the time Curran moved out of his way, he was traveling five miles an hour. He also stated that Keck's vehicle was coming up from behind him at a high rate of speed, which he estimated to be about 50 miles per hour. Daugherty claimed to be driving in a straight course when Keck's vehicle hit him, causing the steering wheel to bend towards him and the driver's seat to break, knocking him onto his back. Daugherty testified that he unsuccessfully attempted to regain his position at the steering wheel prior to the collision with the car in which plaintiff was riding. Daugherty said that as a result of the impact with the Keck vehicle, the van had been propelled across the center line and the inside lane of the eastbound traffic into the Volkswagen's path.

Keck testified that he had been following Daugherty's van at between 30 and 35 miles per hour. Keck stated that he momentarily took his eyes off the roadway in front of him, and when his eyes returned to the roadway, he noticed Daugherty's brake lights were on. Keck estimated that at that point, he was 60 to 70 feet behind Daugherty; he immediately applied his brakes. Keck testified that he hit Daugherty's van at a speed of 10 to 15 miles per hour and that Daugherty's van was proceeding at 5 to 10 miles per hour at the point of impact.

Keck stated that at the time of impact, he was straight behind the van. Keck testified that the impact with the van was "not very hard." He thought his vehicle did not hit Daugherty's with such force as to propel it across the center line, through two lanes of traffic, and into the Volkswagen's path.

In essence, Daugherty contends that Keck's vehicle rear-ended the van into the Volkswagen. Conversely, Keck maintains that the impact of his collision with the van was not sufficient to cause the van's collision with the Volkswagen. This contrary testimony, when viewed in a light most favorable to the plaintiff, does not support a directed verdict in favor of Daugherty and Dura-Bond. Therefore, we find that the trial court erred in granting their motions for directed verdict.

■ Plaintiff next argues that Curran's motion for a directed verdict should not have been granted. We disagree. The only testimony regarding Curran's part in the collisions came from her and Daugherty. Curran stated that she moved into the inside lane to execute a left-hand turn and then, in a stopped position, waited 20 to 30 seconds for the oncoming traffic to clear. Daugherty testified that Curran had quickly changed lanes from the curb lane to the center lane in front of him. Daugherty stated that he was 300 feet behind Curran when her brake lights flashed and that he began pumping his brakes at that time. As a result of Curran's lane change, Daugherty testified that he had to pump his brakes three times to slow his vehicle from a speed of 25 miles an hour to 15 miles an hour. Daugherty said that Curran's stop was so abrupt that it was "hard enough to make [her] car dive. No, not skid, no squeals, but enough to put the nose of that car down to a stop."

Further, Curran testified that while she was stopped in the inside lane waiting to make a left-hand turn, she heard screeching tires behind her and saw, in her rearview mirror, the van coming up behind her, 20 to 30 feet away. Curran stated that she felt the van could not stop before hitting her vehicle, so she moved out of its way into the curb lane.

Daugherty admitted that it would have taken five more seconds in order for the van not to collide with Curran's car. He also stated that he might have "tapped" her car had she not driven it into the curb lane.

Even viewed in the light most favorable to plaintiff, there is insufficient evidence of negligence on the part of Curran to merit a jury's consideration of liability on Curran's part. Therefore, we find the trial court did not err in granting Curran's motion for a directed verdict.

Plaintiff argues that the trial court erred when it did not allow his expert to testify. In the midst of putting on his case, plaintiff sought to introduce the testimony of Fred Monick, an engineer and reconstruction expert. The trial court was unsure as to what Monick would testify to. In an offer of proof, plaintiff's lawyer explicated what Monick's testimony would be: namely, the relevance of the Keck's skid marks to Keck's and Daugherty's testimonies; the angle and force of impact necessary to propel the van into the Volkswagen; the significance of no yaw marks between the point of the Keck-Daugherty impact and the Daugherty-Volkswagen collision; and the impact necessary to force the van's trailer hitch to the position it was in following the accident. Additionally, plaintiff's lawyer stated, "I think what Mr. Monick would say is it's physically impossible given the statements that were made

that the van would have enhanced its speed [following the Keck-Daugherty collision] unless it accelerated \*\*\* given the circumstances of this collision, the only way Daugherty could have accelerated and gotten from the 5 to 10 mile an hour speed he was [at] to hit the Volkswagen was that he *intentionally* did that, and that's what I believe his testimony is." (Emphasis added.) The court granted the motion *in limine* to bar Monick's testimony. In so doing, the court stated that such speculative evidence would not aid the jury in its deliberations.

■■ ■ It is well established that, normally, expert testimony will not be permitted when its subject matter is not beyond the average juror's ken. (*Binge v. J.J. Borders Construction Co.* (1981), 95 Ill. App. 3d 238.) In recent years, this position has been somewhat modified. The modern standard for admissibility of expert testimony is whether such testimony will aid the jurors' understanding of the facts. (*Johnson v. Commonwealth Edison Co.* (1985), 133 Ill. App. 3d 472.) Here, the testimony was sufficiently confusing that an expert's testimony was necessary to determine how the collisions likely occurred. The fact that the jury could not reach a verdict underscores this need.

When the court ruled on the motion banning plaintiff's expert, it had heard the testimony of Officer Koukalik, Curran, Daugherty, and Keck. Only the plaintiff had not testified. By that time, it was clear that the testimony was creating an incomprehensible depiction of what actually occurred. The interplay of the physical forces that caused the collisions was beyond the average juror's ken. Monick's testimony would likely have cleared up some, if not all, of the confusion. The trial court therefore abused its discretion in barring plaintiff's witness. In so finding, we reject defendant's contention that plaintiff's offer of proof regarding Monick's testimony was inadequate. The offer of proof, though somewhat sketchy, did explicate the specific areas of Monick's testimony and his conclusions drawn therefrom. From said offer of proof, the trial court had a sufficiently accurate description of Monick's testimony.

For the reasons stated above, the judgement of the circuit court is reversed, and the cause is remanded for proceedings consistent with this opinion. Specifically, the court should allow plaintiff to present relevant expert testimony.

Reversed and remanded with directions.

REINHARD and McLAREN, JJ., concur.