PERRY KIMBLE *et al.*, Plaintiffs-Appellees, v. EARLE M. JORGENSON COMPANY, Defendant-Appellant.

First District (4th Division)    No. 1—03—3765

Opinion filed June 9, 2005.

Clausen Miller, P.C. (Edward M. Kay and Agelo L. Reppas, of counsel), Patton & Ryan, L.L.C. (David F. Ryan, of counsel), and McGuire Woods, L.L.P. (Jeffrey C. Clark, of counsel), all of Chicago, for appellant.

Law Office of Michael Radzilowsky (Michael Radzilowsky, of counsel), and Law Office of Frank Pirrucello (Frank Pirruccello, of counsel), both of Chicago, for appellees.

JUSTICE QUINN delivered the opinion of the court:

Defendant, Earle M. Jorgenson Company (Jorgenson), appeals from a jury verdict for plaintiffs Perry and Judy Kimble. Perry was injured when a 4,000-pound steel bar, which was being loaded onto the trailer of his flatbed truck by Jorgenson employees, came loose and rolled over his legs, severely damaging his feet and ankles. On appeal, Jorgenson challenges three evidentiary rulings made by the circuit court: (1) barring testimony from Jorgenson's accident reconstruction expert, Dr. Owen Schipplein; (2) admitting a sketch and accompanying narration made by Jorgenson employee Barry Boyd, depicting the accident; and (3) admitting four admittedly "gruesome" photos of plaintiff's preoperative injuries and allowing those photos to be sent

back with the jury during its deliberations. For the following reasons, we affirm the circuit court's evidentiary rulings and the resulting jury verdict for plaintiffs.

## BACKGROUND

On January 4, 1996, plaintiff Perry Kimble (hereinafter plaintiff), a truck driver for 4K's Transportation, arrived at Jorgenson's facility in Schaumburg, Illinois, to pick up a load of steel bars that he was to transport to Seattle. During the loading process, a 4,000-pound steel bar (also known as a "round") came loose from its position on plaintiff's flatbed truck and rolled over his legs. On August 31, 2000, plaintiff and his wife filed suit against Jorgenson, bringing claims of negligence and loss of consortium.

Before trial, the parties filed three motions *in limine* that are relevant here on appeal. In the first, plaintiff sought to bar the testimony of Jorgenson's accident reconstruction expert, Dr. Owen Schipplein, who was retained by Jorgenson to conduct "a biomechanical analysis of the circumstances surrounding [plaintiff's] injuries" and determine "what was the most probable scenario that resulted in [plaintiff] being injured."

To make this determination, Dr. Schipplein testified in his evidence deposition that he reviewed numerous depositions from eyewitnesses, including those of plaintiff and two Jorgenson employees, Sorin Cauc and Faustino Morales, who were involved in the loading process on the day of the accident, as well as plaintiff's medical records and photographs of plaintiff's injuries. Dr. Schipplein also testified that he visited the accident site, observed trailers and steel bars similar to those present at the site on the day of the accident, and spoke with several Jorgenson employees charged with loading steel bars similar to the one that injured plaintiff. Having reviewed this evidence, Dr. Schipplein testified that there were two different scenarios of the accident.

In the first, garnered from plaintiff's deposition, plaintiff stated that he was on the trailer of his truck when the steel bar struck him. Specifically, plaintiff testified that he was in the process of securing the steel bar by nailing four wedges in the corners of that bar, and as he walked from having nailed in the third wedge to the area where he planned to nail down the fourth wedge, the bar began to roll and hit him in the left leg. The bar knocked him down and then rolled over his left foot, crushing it. According to plaintiff, he attempted to jump or bridge onto an adjacent trailer that was parked alongside his trailer (about two feet away), but the bar kept pushing his left foot toward him. Eventually, the bar rolled off of the trailer, and plaintiff fell to the ground.

In the second scenario, based primarily upon the depositions and statements of Jorgenson employees Cauc and Morales, plaintiff was not in the path of the bar when it began to roll. Instead, at some point as it was rolling, plaintiff placed himself in the path of the bar. When he tried to avoid the rolling bar by attempting to jump to the adjacent trailer, he slipped and fell to the ground. According to both Cauc and Morales, plaintiff was injured when the bar fell off the trailer and rolled over him as he lay on the ground.

Dr. Schipplein testified that he believed the second scenario was more likely because plaintiff's injuries were inconsistent with the first scenario. Specifically, Dr. Schipplein stated:

> "Well, [plaintiff's] injuries are a degloving injury. He's got a—a broken left ankle and a fractured right leg. And in this scenario that he stated where he was walking and the bar began to roll, as I said, he would have either been crushed, as I'm depicting here and fatally injured, or he would have been crushed to the point where the bar stopped and wedged his body."

Dr. Schipplein concluded that plaintiff caused his own injuries by putting himself in the path of the bar and by reacting poorly to the bar once it began to roll. He also concluded that had plaintiff not reacted, no injury would have occurred.

During cross-examination, Dr. Schipplein stated that he used his expertise in biomechanics and anthropometry to determine that plaintiff's version was not accurate. He stated that plaintiff would not have been able to move, no less attempt to jump to the adjacent trailer, if the 4,000-pound bar had rolled onto his foot. He also testified that plaintiff was not tall enough to form a bridge between his trailer and the adjacent trailer parked a few feet away. Dr. Schipplein admitted, however, that he did not use any formulas or "crunch" any numbers to arrive at his conclusions.

According to his motion *in limine*, plaintiff contended that "none of the opinions which have been formed pursuant to [Dr. Schipplein's] accident reconstruction are sufficiently sophisticated to be 'beyond the ken of the average juror.'" The circuit court agreed and granted plaintiff's motion.

Though acknowledging Dr. Schipplein's "expertise in the area of how human beings' height or weight would cause his body to behave in certain circumstances," the circuit court stated that, "in reviewing his report I'm at a loss to see where he applies any of these scientific principles in order to reach [his] conclusion." The court also found that Dr. Schipplein's conclusions were not beyond common knowledge:

> "[I]t seems to me that a jury is as capable of deciding what happens when a 2 ton gorilla is sitting on top of you as this gentleman

who makes the bald statement without any scientific support that no human being could move out from under this weight."

The court further noted that Dr. Schipplein had failed to "crunch any numbers" in reaching his conclusions:

"Well, if he sat up there and crunched the numbers and the numbers had some scientific validity, if it met the threshold of reliable science that I as a gatekeeper could allow, if he sat there and crunched numbers and the numbers indicated a particular result and it arguably assisted the jury in deciding an issue in the case, then I think you're entitled to the testimony.

But in the absence—if he didn't bother to crunch the numbers, I'm certainly not going to let him crunch them now, his opinion is no better than yours or mine.

**\***

Unless he can say that based on—well, I'm postulating now, unless he can say that in the range of human experience no human being could exert more than so many pounds of pressure per square inch of resistence to an object weighing so many pounds and therefore the object must necessarily have crushed him, unless he can testify with that degree of scientific certainty, it seems to me that his opinion is no better than the average juror's."

After hearing argument on the motion, the court granted plaintiff's motion to bar Dr. Schipplein's testimony, stating "[t]his case involves nothing more than this man's opinions on a matter where I think the jury is just as able to decide as he is."

In the second motion *in limine*, Jorgenson sought to bar plaintiff from using a diagram and accompanying narration[1] of the accident made by Jorgenson employee Barry Boyd on the grounds that "it is part of the subsequent remedial measures taken by [Jorgenson], it is

---

[1] The diagram depicts two "Truck Trailers." On top of one of the trailers, two stick figures appear, one of which is labeled "Sorin—Loading Crew Truck Man," and the other "Truck Driver." There is also a steel bar connected to a chain that is located in the middle of the trailer on which the "Truck Driver" stick figure appears. The "Truck Driver" is drawn as being in the middle of the steel bar. There are also two arrows, one pointing from the steel bar toward the second trailer and one pointing from the "Truck Driver" to another stick figure labeled "Truck Driver" located on the second trailer. The narration on the diagram states:

"Truck Driver jumped from his trailer, to trailer that was sitting adjacent to his trailer, in order to get out of the way from the [bar] that was rolling toward him. There was 20' tubing loaded on the left side of the adjacent trailer which caused him to slip off the side of the adjacent trailer, resulting in getting hit by the [bar] which rolled off his trailer."

misleading and because plaintiff cannot lay a foundation for its admission at trial." According to Jorgenson's motion, Boyd had been asked to conduct a "subsequent remedial investigation" and make recommendations "to prevent the recurrence of the accident that injured [plaintiff]."

During the hearing on Jorgenson's motion held before opening statements were set to begin, Jorgenson's counsel told the court that Boyd did not witness the accident himself and that his "entire report was based on second-hand information." Jorgenson's counsel admitted that Boyd did speak to "one person regarding the general scenario of the accident," but that person had also not personally witnessed the incident. Counsel stated:

> "Mr. Boyd was just a member of the safety committee at [Jorgenson], and he was the author of the memo that you did exclude which listed six things that might have prevented the accident as a subsequent remedial measure. That's his only involvement."

Counsel also stated that the diagram was "absolutely misleading" and "not drawn to scale."

After Jorgenson's counsel had finished his argument, the following colloquy occurred:

> "THE COURT: Who is calling Mr. Boyd?
>
> [Jorgenson's Counsel]: We have him listed if they're going to get this in. They have him listed if they can—.
>
> THE COURT: How are they going to get the drawing in without Mr. Boyd?
>
> [Jorgenson's Counsel]: Well, that's my problem. They're planning on using it in opening statement. I'm trying to keep it out. They can't—.
>
> [Plaintiff's Counsel]: I think it's a business record—.
>
> THE COURT: Have you intended to call him on adverse?
>
> [Plaintiff's Counsel]: Yes, we intended to call him on adverse."

After hearing argument, the circuit court granted Jorgenson's motion in part, excluding any reference to subsequent remedial measures, but denied the motion as to the diagram and accompanying narration, finding that the latter were admissible as business records. Rejecting Jorgenson's "unreliability" argument, the circuit court stated:

> "I think this document is clearly a record kept in the ordinary course of business of what was believed to have occurred at the time. This comes in.
>
> Now, if it's not accurate, you're free to point out on cross that this is not based on an eyewitness—was not prepared by somebody who saw the accident happen. You're free to introduce any evidence that you can as to—you can make your own diagram that you think more correctly reflects what occurred."

During opening statements, plaintiff's counsel displayed the diagram and read the accompanying narration to the jury without a contemporaneous objection by Jorgenson's counsel. During plaintiff's case in chief, before the trial resumed, Jorgenson renewed its objection to plaintiff's use of the diagram and narration:

"On J2, which is the drawing, your Honor, Mr. Boyd—we would be able to call him in to testify that it's—as you're ruling, you admitted that over objection. We discussed that the other day. I just want to be clear: If we call in Mr. Boyd to testify that he was asked just to prepare a general scenario based on some limited admissions given him; not from an eyewitness; he didn't attempt to draw it to scale; he didn't attempt to do an accurate depiction of what actually occurred in this accident, I just want to make sure that's not going to be construed as opening a door to his investigation, which was subsequent remedial measures and [were] barred."

After the circuit court overruled Jorgenson's objection, plaintiff's counsel again read the narration to the jury and passed around the diagram for each juror to see without calling Barry Boyd or anyone else from Jorgenson. Jorgenson did not make a contemporaneous objection to the manner in which plaintiff's counsel admitted the diagram and narration into evidence. The next day, before the trial recommenced, Jorgenson's counsel objected, stating:

"Just we're going to place an objection on the record, your Honor, as to the plaintiffs reading into the record and to the jury the business records identified yesterday in court. They said they were, obviously, summaries and not prepared by anyone who is a witness to the incident."

The circuit court noted, but overruled, Jorgenson's objection.

During its case in chief, Jorgenson called Boyd, who testified that he made the diagram at the behest of the plant manager; he did not witness the accident personally; he drew the diagram after speaking to an employee who had not witnessed the accident; he could not remember the employee's name; and the diagram was not drawn to scale. Boyd stated that he was only asked to draw a diagram and not to conduct an investigation or determine how the accident occurred.

In the third motion, Jorgenson sought to bar plaintiff from admitting several "gruesome" photographs of plaintiff's injuries because "the prejudice caused by admission of such photographs would outweigh any possible probative value." The circuit court barred any photos of plaintiff's injuries taken during surgery, but allowed plaintiff to use four preoperative photos as being relevant to plaintiff's pain and suffering. These photos were used as exhibits by plaintiff's treating physicians during their testimonies in his case in chief. The photos were also sent back with the jury during its deliberations.

After trial, the jury found Jorgenson liable and awarded plaintiff $4 million in damages on his negligence claim and $100,000 to his wife for loss of consortium. The jury also found that plaintiff was 25% at fault and reduced the amount of the awards accordingly. Jorgenson filed a timely notice of appeal.

## ANALYSIS

It is well settled that we review each of the three evidentiary rulings challenged by Jorgenson here on appeal for an abuse of discretion. See *Beehn v. Eppard*, 321 Ill. App. 3d 677, 680 (2001) (noting that generally a trial court's motion *in limine* rulings are reviewed for an abuse of discretion); *Wiegman v. Hitch-Inn Post of Libertyville, Inc.*, 308 Ill. App. 3d 789, 799 (1999) (stating that the admission of an expert's testimony lies within the sound discretion of the trial court); *In re Joseph S.*, 339 Ill. App. 3d 599, 608 (2003) ("A trial court decision on the admission of a document as a business record is a matter of discretion and is disturbed only for an abuse of that discretion"); *DiCosola v. Bowman*, 342 Ill. App. 3d 530, 534 (2003) (stating that the admissibility of photographs normally rests within the sound discretion of the circuit court). An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or where there is an application of impermissible legal criteria. See *Agnew v. Shaw*, 355 Ill. App. 3d 981, 990, 823 N.E.2d 1046, 1054 (2005). A reviewing court may sustain an evidentiary ruling by the trial court for any appropriate reason, regardless of whether the trial court relied on that reason or whether the trial court's reasoning was correct. See *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995).

### A. Barring Dr. Schipplein's Testimony

Jorgenson first argues that the circuit court abused its discretion in barring Dr. Schipplein's testimony, the sum and substance of which Jorgenson stated as follows:

> "Dr. Schipplein would have explained that if the bar had hit plaintiff on the trailer, as plaintiff testified, the bar would have either pinned his body to the trailer or continued to roll over him, fatally injuring him. Rather, plaintiff's injuries were likely caused by him jumping into the path of the rolling bar in an attempt to avoid being hit."

Jorgenson maintains that this testimony "would have assisted the jury in understanding the interplay of physical forces that caused the accident and determining the manner of plaintiff's injuries." Jorgenson also argues that the circuit court's error was prejudicial because it "gutted" its theory on the "central controversies" in the case, *i.e.*, how the accident occurred and who was at fault.

■ "Generally, the opinion testimony of an expert is admissible if the expert is qualified by knowledge, skill, experience, training, or education in a field that has 'at least a modicum of reliability' and the testimony would assist the jury in understanding the evidence." *Turner v. Williams*, 326 Ill. App. 3d 541, 552 (2001), quoting *Wiegman*, 308 Ill. App. 3d at 799. However, an expert's opinion is only as valid as the reasons for the opinion. *Soto v. Gaytan*, 313 Ill. App. 3d 137, 146 (2000). Thus, the party calling an expert witness must lay a foundation sufficient to establish that the information upon which the expert bases his opinion is reliable." *Turner*, 326 Ill. App. 3d at 553.

■ Whether to admit expert reconstruction testimony turns on the usual concerns of whether expert opinion is appropriate generally. *Zavala v. Powermatic, Inc.*, 167 Ill. 2d 542, 546 (1995). As such, for reconstruction testimony to be admissible, there must be sufficient data about the accident in evidence to provide a reasonable basis for the expert's opinion. *Hiscott v. Peters*, 324 Ill. App. 3d 114, 123 (2001).

In addition, where eyewitness testimony of the accident is available, accident reconstruction testimony may be used to supplement the eyewitness testimony as long as such testimony "would be needed to explain scientific principles to a jury and enable it to make factual determinations." *Watkins v. Schmitt*, 172 Ill. 2d 193, 206 (1996) ("[T]he fact that there were three eyewitnesses who could testify as to the speed of the cement truck does not amount to an absolute bar to expert reconstruction testimony. Instead, we look at whether, in addition to eyewitness testimony, expert reconstruction testimony would be needed to explain scientific principles to a jury and enable it to make factual determinations"); *Zavala*, 167 Ill. 2d at 546, quoting *Plank v. Holman*, 46 Ill. 2d 465, 471 (1970) (stating that "expert reconstruction testimony is proper, even where there is an eyewitness, if what the expert offers is 'knowledge and application of principles of science beyond the ken of the average juror' "). Evidence is "beyond the ken" of the average juror when it involves knowledge or experience that a juror generally lacks. *Rinesmith v. Sterling*, 293 Ill. App. 3d 344, 348 (1997).

■ According to his evidence deposition, Dr. Schipplein determined that of the two accident scenarios presented by the evidence he reviewed, the scenario offered by Jorgenson's employees (that plaintiff was injured while on the ground) was "more likely." Dr. Schipplein concluded that had plaintiff been hit by the steel bar while on the trailer as he testified, his foot would have been pinned down, he would not have been able to lunge for the adjacent truck, and the bar would have either continued to roll over him, crushing him to death, or a "wedging effect" would have occurred between the bar and plaintiff's

body. Dr. Schipplein opined that because plaintiff was not killed and because there was no evidence that a "wedging effect" had occurred, the latter scenario, *i.e.*, where plaintiff fell off the trailer and was hit by the bar on the ground, was more accurate. In reviewing Dr. Schipplein's evidence deposition, it is difficult to characterize his opinions as being beyond the ken of the average juror.

Dr. Schipplein's basis for discounting plaintiff's scenario of the accident basically boils down to his belief that plaintiff would not have been able to move if the 4,000-pound steel bar had rolled on top of his foot. However, Dr. Schipplein admittedly did not "crunch any numbers" or utilize any formula in reaching this conclusion, an omission that the circuit court relied upon in barring his testimony. Though the failure to engage in a mathematical analysis is not controlling on the question of whether an expert's opinion is "beyond the ken of the average juror," it does not appear that Dr. Schipplein's conclusion was too sophisticated for the average juror to arrive at independently. See *Watkins*, 172 Ill. 2d at 206 (finding circuit court properly barred expert reconstruction testimony concerning the speed of a car and distinguishing *Zavala* because "[t]he expert in *Zavala* was able to determine that because a reamer spins at a high velocity and has no cutting surface it could not cut but could only pull off a user's fingers. Unlike estimating the speed of a car, this is not the type of knowledge that a lay person could obtain after watching a drill press in operation. This type of analysis requires knowledge of the mechanics of a reamer and an application of scientific principles to determine that it could only cause certain types of injuries to its users").

If Dr. Schipplein's conclusion was indeed based upon scientific principles beyond the ken of the average juror, he failed to adequately explain these principles and how he applied them to the facts here to arrive at his conclusion in his evidence deposition. Moreover, though Dr. Schipplein stated that plaintiff's injuries were inconsistent with his version of the accident, nowhere does he show how he reached that conclusion or how plaintiff's injuries were, instead, consistent with the scenario offered by Jorgenson's employees. Nowhere does he point to the way plaintiff's legs were broken, how plaintiff's boot was torn, the flesh injuries to plaintiff's ankles, etc. to support his opinion.

Surely, the accident itself involved physical forces, scientific principles, and other issues potentially beyond the ken of the average juror, and Dr. Schipplein was unquestionably qualified to educate the jury about those forces, principles, and issues, and help it to make factual determinations. The problem here is that his evidence deposition testimony does not reflect either of these givens. Either his opinions were not based upon matters beyond the ken of the average

juror or, if they were, then he simply failed to "show his work" in that deposition. In light of the fact that there was available eyewitness testimony of the accident, we cannot say that the circuit court abused its discretion in barring Dr. Schipplein's testimony.

Jorgenson relies primarily upon *Zavala* and *Ketchum v. Dura-Bond Concrete, Inc.*, 179 Ill. App. 3d 820 (1989), to support its argument that the circuit court abused its discretion in barring Dr. Schipplein's testimony. In *Zavala*, the plaintiff lost two of her fingers in a drill press accident. *Zavala*, 167 Ill. 2d at 543. Suing the manufacturer of the drill press, the plaintiff alleged that her fingers had been "cut off" by the drill press, which was equipped with a " 'reamer.' " *Zavala*, 167 Ill. 2d at 543. The defendant called an accident reconstruction expert over the plaintiff's objection, who testified that the plaintiff's fingers could not have been "cut off" by this machine because "a spinning reamer presented only an entanglement, not a cutting, hazard." *Zavala*, 167 Ill. 2d at 544. Instead, in the expert's opinion, "the accident could have happened only because the glove [that the plaintiff] wore became caught up by the reamer." *Zavala*, 167 Ill. 2d at 544.

In reaching these conclusions, the expert "reviewed all of the deposition testimony generated for the litigation," "inspected the drill press," "tested the workings of the 'on/off' switch," and "took timed photographs of the reamer's operation to study how many revolutions would take place after the press had been turned off." *Zavala*, 167 Ill. 2d at 545. After the jury returned a verdict in favor of the defendant, the plaintiff appealed. *Zavala*, 167 Ill. 2d at 543.

The appellate court vacated the jury's verdict in favor of the manufacturer, finding that the expert's testimony was improperly admitted because (1) it was "based upon 'mere conjecture,' noting a lack of 'reconstruction models or experiments,' " and (2) it related to the " 'ultimate issue' in the case: whether entanglement of [the plaintiff's] glove with the reamer caused the injury." *Zavala*, 167 Ill. 2d at 544.

The supreme court reversed. After dispelling the misconception that experts cannot testify as to the ultimate issue in a case, the court found that the expert's opinion should have been admitted:

> "[The expert's] testimony was appropriate in this case. [He] possessed expertise in 'human factors engineering,' a study of the relationship of man to machinery, including human motor coordination and reaction time. His opinion as to how the accident happened focused on human factors and the nature of the reamer's operation. The information imparted by [the expert] was certainly 'beyond the ken of the average juror' and was proper notwithstanding [the plaintiff's] own testimony." *Zavala*, 167 Ill. 2d at 546.

The court also noted that the plaintiff "enjoyed the opportunity to present her own engineering expert," which, the court found "would provide a separate basis for allowing [the expert's] testimony." *Zavala*, 167 Ill. 2d at 547.

In *Ketchum*, the plaintiff was injured when the car that he was riding in was involved in a head-on collision with a van that had swerved into the plaintiff's car after being rear-ended by another car. *Ketchum*, 179 Ill. App. 3d 821-25. During trial and after several eyewitnesses had testified, the plaintiff attempted to introduce the testimony of a reconstruction expert who, according to the plaintiff counsel's offer of proof, would have testified to the following:

> "[T]he relevance of *** Keck's skid marks to Keck's and Daugherty's testimonies; the angle and force of impact necessary to propel the van into the Volkswagen; the significance of no yaw marks between the point of the Keck-Daugherty impact and the Daugherty-Volkswagen collision; and the impact necessary to force the van's trailer hitch to the position it was in following the accident." *Ketchum*, 179 Ill. App. 3d at 830.

The expert concluded from his analysis that the accident could not have occurred the way in which the defendants said it did. *Ketchum*, 179 Ill. App. 3d at 830-31. The circuit court granted the defendants' motion *in limine* barring this testimony because "such speculative evidence would not aid the jury in its deliberations." *Ketchum*, 179 Ill. App. 3d at 831.

The appellate court reversed, finding that the trial testimony "was sufficiently confusing that an expert's testimony was necessary to determine how the collisions likely occurred." *Ketchum*, 179 Ill. App. 3d at 831. The court stated that the prior trial testimony that had been given "was creating an incomprehensible depiction of what actually occurred," "[t]he interplay of the physical forces that caused the collisions was beyond the average juror's ken," and the expert's "testimony would likely have cleared up some, if not all, of the confusion." *Ketchum*, 179 Ill. App. 3d at 831. We find Jorgenson's reliance upon both *Zavala* and *Ketchum* unpersuasive.

Here, like the expert in *Zavala*, Dr. Schipplein testified that he focused on human factors and the interplay of physical forces upon the human body in determining which of the two scenarios more likely occurred. Unlike in *Zavala*, however, the injurious object here was not a sophisticated machine, the workings of which were beyond the knowledge of the average juror; it was a steel bar. We presume, as did the circuit court below, that the average juror would know from having observed a cylindrical object that such objects are capable of rolling and that a rolling 4,000-pound steel bar could cause injuries like

the kind sustained by plaintiff. See *Watkins*, 172 Ill. 2d at 206 (distinguishing *Zavala* because "[t]he expert in *Zavala* was able to determine that because a reamer spins at a high velocity and has no cutting surface it could not cut but could only pull off a user's fingers. Unlike estimating the speed of a car, this is not the type of knowledge that a lay person could obtain after watching a drill press in operation. This type of analysis requires knowledge of the mechanics of a reamer and an application of scientific principles to determine that it could only cause certain types of injuries to its users").

Furthermore, unlike in *Ketchum*, the eyewitness accounts of the accident here were not "sufficiently confusing"; nor did they create an "incomprehensible depiction of what actually occurred." *Ketchum*, 179 Ill. App. 3d at 831. There were three eyewitnesses, whose testimonies created two competing scenarios of the accident. The complexities of an accident like that in *Ketchem* were simply not present here (or if they were, Dr. Schipplein did a poor job in saying so).

To the extent that physical forces were in play during the accident, Dr. Schipplein admitted that he did not engage in any "number crunching" to determine how those forces acted to injure plaintiff. He also failed to sufficiently explain why plaintiff's version of the accident could not have occurred due to the existence of those forces. In essence, Dr. Schipplein was simply acting the role of a referee between the two competing scenarios, and his reasons for discounting plaintiff's scenario do not appear to be beyond the ken of the average juror. Thus, we find that the circuit court did not abuse its discretion in barring his testimony.

### B. Boyd's Diagram And Accompanying Narration

Jorgenson next argues that the circuit court abused its discretion in admitting Boyd's diagram and accompanying narration under the business records exception to the hearsay rule[2] because (1) plaintiff "never actually laid the foundation for [their] admission under [the business records] exception to the hearsay rule" and (2) both the

---

[2]Though it appears that this evidence would also qualify as an admission by the employee of a party opponent (see *Halleck v. Coastal Building Maintenance Co.*, 269 Ill. App. 3d 887, 892-93 (1995) (stating that out-of-court statement by servant of party opponent is admissible so long as the statement concerns a matter within the scope of the servant's employment and the servant was actually employed at the time statement was made)), and though at one point plaintiff argued as much, the circuit court admitted the evidence based upon the business records exception. Plaintiff on appeal does not make this alternative argument.

diagram and the narration were unreliable because they were based "solely on the unsubstantiated hearsay statements of an unidentified Jorgenson employee." Jorgenson contends that it was prejudiced because it was unable to test the trustworthiness of this unnamed employee. Jorgenson also argues that because this evidence was not based upon an eyewitness account and because the diagram was not drawn to scale, the jury could have been confused or misled by it, and, thus, the circuit court should not have admitted it.

The theory upon which entries made in the regular course of business are admissible as an exception to the hearsay rule is that "since their purpose is to aid in the proper transaction of the business and they are useless for that purpose unless accurate, the motive for following a routine of accuracy is great and the motive to falsify nonexistent." M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.10, at 817 (7th ed. 1999), citing *Chicago & Alton R.R. Co. v. American Strawboard Co.*, 190 Ill. 268 (1901). Thus, it makes no difference whether the records are those of a party or of a third person authorized by the business to generate the record on the business's behalf. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.10, at 817 (7th ed. 1999), citing *Argueta v. Baltimore & Ohio Chicago Terminal R.R. Co.*, 224 Ill. App. 3d 11 (1991).

■ Supreme Court Rule 236, which codifies the business records exception to the hearsay rule, states:

"Any writing or record, whether in the form of any entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of the act, transaction, occurrence, or event, if made in the regular course of *** business to make such a memorandum or record at the time of such an act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility." 145 Ill. 2d R. 236(a).

Because the accuracy of the record is presumed (for how could an inaccurate business record be of any value to the business that produced it?), Rule 236 requires only that the party tendering the record satisfy the foundational requirements that (1) the record was made in the regular course of business and (2) at or near the time of the event or occurrence. See *In re Estate of Weiland*, 338 Ill. App. 3d 585, 600 (2003). A sufficient foundation for admitting records may be established through testimony of the custodian of records or another person familiar with the business and its mode of operation. *Weiland*, 338 Ill. App. 3d at 600.

Though records made with a view toward possible litigation do not qualify as "made in the ordinary course of business" (see *In re Joseph S.*, 339 Ill. App. 3d at 608), a record made in response to a singular occurrence or event does not require the conclusion that it was not made in the regular course of business (*Weiland*, 338 Ill. App. 3d at 601-02). Additionally, while the lack of personal knowledge by the maker of the record may affect the weight of the evidence, it does not affect its admissibility. *Weiland*, 338 Ill. App. 3d at 601, citing *Amos v. Norfolk & Western Ry. Co.*, 191 Ill. App. 3d 637, 646 (1989).

█ In this case, the diagram was made by Boyd, a Jorgenson employee, at the behest of his supervisor. Though Boyd denied at trial that he was asked to conduct an investigation, Jorgenson's counsel argued during the hearing on its motion *in limine* that the diagram was part of Boyd's investigation into subsequent remedial measures. Moreover, both the diagram and narration were made within a few days after the accident. Because the diagram and narration were made in the regular course of business at or near the time of the event, they qualified as a business record under Rule 236. See 145 Ill. 2d R. 236(a); *Weiland*, 338 Ill. App. 3d at 600.

Jorgenson argues that this evidence was improperly admitted because (1) neither Boyd nor the unnamed employee Boyd spoke to before sketching the diagram had personally witnessed the accident and (2) the diagram was not drawn to scale. Those failings, however, affect only the weight, and not the admissibility, of this evidence. See 145 Ill. 2d R. 236(a) (*"All other circumstances* of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility" (emphasis added)). Thus, the circuit court properly found that the diagram and accompanying narration were admissible as business records under Rule 236.

There is no question, however, that the manner in which plaintiff's counsel introduced this evidence to the jury was improper. "In civil cases in Illinois, the basic rules of evidence require a proponent of documentary evidence to lay a foundation for the introduction of that document into evidence." *Anderson v. Human Rights Comm'n*, 314 Ill. App. 3d 35, 42 (2000). Besides Rule 236's two foundational requirements for business records, *i.e.*, that the document was made in the regular course of business at or near the time of the transaction, "[e]vidence must be presented to demonstrate that the document is what its proponent claims it to be." *Anderson*, 314 Ill. App. 3d at 42. Most often, this is accomplished through the testimony of a witness who has sufficient personal knowledge to satisfy the trial court that a particular item is, in fact, what its proponent claims it to be. See *Cisarik v. Palos Community Hospital*, 144 Ill. 2d 339, 342 (1991).

"Without proper authentication and identification of the document, the proponent of the evidence has not provided a proper foundation and the document cannot be admitted into evidence." *Anderson*, 314 Ill. App. 3d at 42. The purpose of requiring a foundation is to prevent " 'inadmissible evidence from being suggested to the [trier of fact] by any means.' " *Anderson*, 314 Ill. App. 3d at 42, quoting M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 901.1, at 905 (7th ed. 1999).

Instead of calling Boyd or anyone else to identify and authenticate the diagram, and establish that it was made in the regular course of business at or near the time of the event, plaintiff's counsel simply read the narration and displayed the diagram to the jury, first during his opening statement and later during plaintiff's case in chief. Even though there was no contemporaneous objection made by Jorgenson either time, we find that the circuit court erred in allowing plaintiff to introduce this evidence in this manner.

That being said, we would be hard-pressed to find that Jorgenson was prejudiced by this error. First, plaintiff's *prima facie* case did not depend on the admission of the diagram. While it may have bolstered plaintiff's claim that he was located on the truck when the bar struck him, it was not the only evidence that tended to establish Jorgenson's negligence.

Second, Jorgenson did not dispute that the diagram was drawn by its own employee, made at or near the time of the accident, and kept in the ordinary course of business. Instead, the main thrust of Jorgenson's argument as to why the diagram was inadmissible was that the diagram was unreliable and misleading because Boyd did not personally witness the accident, the unnamed employee with whom Boyd spoke before making the diagram had not witnessed the accident, and the diagram was not drawn to scale. As stated above, these failings were irrelevant to the issue of admissibility. See 145 Ill. 2d R. 236(a).

Third, the narration on the diagram actually supported the version of the accident as related by defense witnesses Cauc and Morales. According to that narration:

"Truck Driver jumped from his trailer, to trailer that was sitting adjacent to his trailer, in order to get out of the way from the [bar] that was rolling toward him. There was 20' tubing loaded on the left side of the adjacent trailer which *caused him to slip off the side of the adjacent trailer, resulting in getting hit by the [bar] which rolled off his trailer.*" (Emphasis added.)

Just as Cauc and Morales testified, the narration indicates that plaintiff was hit by the bar while on the ground.

Finally, Jorgenson called Boyd as a witness during its case in chief,

and, thus, the jury was aware of the diagram's alleged shortcomings as argued by Jorgenson. While we do not condone the manner in which the diagram was admitted into evidence, we find that Jorgenson was not prejudiced.

## C. "Gruesome" Photographs of Plaintiff's Injuries

■ Jorgenson finally argues that the circuit court erred by admitting into evidence four preoperative photographs of plaintiff's injuries, which the court itself characterized as "gruesome," and by allowing those photos to be sent back with the jury during its deliberations. Jorgenson contends that there was sufficient evidence of plaintiff's injuries given by plaintiff's treating physicians and that these photos were too prejudicial, serving only to invoke sympathy for plaintiff.

The admissibility of photographs normally rests within the sound discretion of the circuit court. See *DiCosola v. Bowman*, 342 Ill. App. 3d 530, 534 (2003), citing *Bullard v. Barnes*, 102 Ill. 2d 505, 519 (1984). While admissibility of photographs depicting injuries is stated to be within the sound discretion of the court, the standard to be applied favors admissibility. See *Darling v. Charleston Community Memorial Hospital*, 50 Ill. App. 2d 253, 321 (1964); see also *Hiscott*, 324 Ill. App. 3d at 124 (stating that, generally, relevant evidence is admissible). Moreover, if a photograph has sufficient probative value, it should be admitted in spite of the fact that it may be gruesome or inflammatory. See *Cancio v. White*, 297 Ill. App. 3d 422, 433 (1998), citing *Bullard*, 102 Ill. 2d at 519; see also *Drews v. Gobel Freight Lines, Inc.*, 144 Ill. 2d 84, 100-01 (1991).

In this case, the photographs, though "gruesome," were certainly relevant to the issue of plaintiff's pain and suffering and arguably relevant to how plaintiff sustained his injuries. See *Drews*, 144 Ill. 2d at 101 (finding that "the trial court could have validly determined that the photograph [of the decedent's injuries] was relevant to show the extent of the decedent's pain and suffering immediately after the accident"); *Bullard*, 102 Ill. 2d at 519-20 (finding circuit court did not abuse its discretion in admitting morgue photos of decedent because "the photographs here at issue were not so inflammatory or gruesome as to outweigh their probative value in assisting the jury's determination of the extent of decedent's pain and suffering"). As stated above, gruesomeness alone is not enough to warrant exclusion. See *Bullard*, 102 Ill. 2d at 519-20; see also *Drews*, 144 Ill. 2d at 100-01 (holding that while the two morgue photographs showing multiple lacerations of decedent's face and throat and burns on right knee were "indeed gruesome," they were not "so gruesome that it appears to us that the trial court abused its discretion in allowing them into evidence"); *De*

*Rosa v. Albert F. Amling Co.,* 84 Ill. App. 3d 64, 77 (1980) (holding that color photograph of injury was properly admitted over objection that it was brutally graphic).

In light of the general rule that relevant evidence should be admitted (see *Hiscott,* 324 Ill. App. 3d at 124; *Darling,* 50 Ill. App. 2d at 321), we find that the circuit court did not abuse its discretion in admitting the photos.

Affirmed.

REID, P.J., and GREIMAN, J., concur.