RITA AGNEW, Plaintiff-Appellant, v. CHARLES T. SHAW *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—02—3233

Opinion filed January 28, 2005.

982

Clifford Law Offices, of Chicago (Robert A. Clifford, Robert A. Strelecky, and Robert P. Sheridan, of counsel), for appellant.

Stamos & Trucco (Michael T. Trucco and Julie N. Howie, of counsel), and Cassiday, Schade & Gloor (Bruce M. Wall and Donald F. Ivansek, of counsel), both of Chicago, for appellees.

JUSTICE NEVILLE delivered the opinion of the court:

Plaintiff, Rita Agnew, filed a lawsuit against the three defendants—Charles Shaw, M.D., an internist; Henry Wiggins, M.D., a radiologist; and Universal Radiology, Ltd., Dr. Wiggins' corporation—alleging a failure to timely diagnose her occult breast cancer. After a trial, the jury returned a verdict in favor of the defendants. Plaintiff now appeals from the jury verdict in favor of the defendants and presents two issues for our review: (1) whether the trial court erred by striking the extrapolation testimony of the plaintiff's expert witness pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); and (2) whether the plaintiff was denied a fair trial when the defendants' *Frye* objection was raised in a motion *in limine*. In this case there are no issues raised on the pleadings.

## BACKGROUND

In 1997, plaintiff was 79 years old and diagnosed with a rare form of breast cancer known as occult primary breast cancer. Only 1% of breast cancer patients have this form of cancer. Following her diagnosis, the plaintiff underwent extensive chemotherapy and radiation treatment and eventually received a radical mastectomy. On November 18, 1998, plaintiff filed a two-count complaint against the defendants alleging that the defendants were negligent because they

misinterpreted the mammograms that were taken in February of 1996 and April of 1997 and failed to timely diagnose her breast cancer.

## THE DEFENDANTS' MOTION *IN LIMINE*

Prior to the commencement of the trial, the parties filed motions *in limine* and a hearing on the motions was commenced by the trial court. Defendant Dr. Wiggins presented a motion *in limine* entitled "Defendant Henry Wiggins, M.D. and Universal Radiology, Ltd.'s Motion in Limine No. 4 to bar testimony of David Schapira, M.D. concerning linear and progressive growth of lymph nodes." Dr. Shaw joined in Dr. Wiggins' motion *in limine*. The transcript from Dr. Schapira's deposition was appended to the defendants' motion. Defendants' motion *in limine* sought to bar certain opinions disclosed by Dr. Schapira during his deposition. It was the defendants' position that Dr. Shapira's backward extrapolation opinions were not generally accepted in the oncologic community. Dr. Wiggins' motion *in limine* was brought pursuant to the *Frye* case, which holds that expert testimony will only be admitted when "the thing from which the deduction is made [is] sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014. The following day, without an objection from the plaintiff's counsel, the court decided to conduct the *Frye* hearing piecemeal.

## THE PLAINTIFF'S CASE

The next day the trial commenced, and the plaintiff called Dr. Shaw (her internist), Dr. Schapira (her proximate cause expert), Dr. Alfred Torrence and Dr. Peter Jokich (her standard of care experts), Dr. Wiggins (called as an adverse witness), Dr. Rossof (her oncologist), and her daughter, Kathleen Studenroth, as witnesses in her case. The plaintiff also testified on her own behalf.

Dr. Shaw, the first witness, testified that he was a board-certified internist, and he began his treatment of the plaintiff on December 27, 1990. Between 1990 and 1995, Dr. Shaw rendered care and treatment to the plaintiff on 22 separate occasions for various ailments, including her thyroid, high blood pressure, diabetes, cholesterol problems, and other chronic problems. Dr. Shaw performed his first mammogram on the plaintiff in January of 1991, which revealed nothing abnormal. He testified that he did not interpret the radiographic films, but relied on a radiologist to do so. He testified that from 1991 through 1995, none of the plaintiff's mammograms or physical examinations revealed abnormalities. Furthermore, plaintiff had no physical complaints which would have led him to believe that she had breast cancer.

On August 21, 1995, Dr. Shaw ordered another mammogram,

which revealed "nodes in both axillae" (nodes in both armpits). There was also a label affixed to the X ray which indicated that the mammogram was abnormal. After seeing the report, Dr. Shaw testified, he had plaintiff come in for an evaluation on August 31, 1995, to ensure that this was not a cancerous process. During her physical examination, Dr. Shaw was unable to palpate or feel any enlarged lymph nodes, which "somewhat" ruled out cancer because cancer is usually firm and hard. He testified that other factors can cause enlarged lymph nodes as well, and he thought that the cause of plaintiff's enlarged lymph nodes could have been an infection or an inflammation from her past chronic sinus infections. He also ordered a complete blood count, which came back normal. Therefore, he told plaintiff to return in six months for another mammogram.

In December of 1995, Dr. Shaw performed another physical examination on the plaintiff, at which time he was, once again, unable to palpate the lymph nodes after conducting a physical examination of the plaintiff's breasts and axillae. Plaintiff returned in February of 1996 for her six-month mammogram, which revealed that nothing had changed since the August 1995 X ray. Dr. Wiggins' report indicated that although the lymph nodes were still enlarged, they had not gotten any larger. The report also indicated "no radiographic evidence of malignancy," and Dr. Wiggins recommended yearly mammograms.

Dr. Shaw saw the plaintiff again on June 13, 1996, and he performed another examination on plaintiff's breasts and axillae, but was unable to palpate anything. However, the findings from this examination were not recorded on Dr. Shaw's chart. In December of 1996, the plaintiff returned to Dr. Shaw reporting that she could feel something in the tail of her breast. During that office visit, Dr. Shaw was able to palpate something and referred the plaintiff to a surgeon, Dr. Leonard. Finally, Dr. Shaw testified that he did not, in his opinion, deviate from the standard of care in rendering care and treatment to the plaintiff.

When Dr. Shaw concluded his testimony, on February 28, 2002, the court continued the *Frye* hearing in chambers. Dr. Schapira was brought into the judge's chambers and examined by both counsel concerning his testimony on the linear progressive growth of lymph nodes. Dr. Schapira testified that because the plaintiff had nine lymph nodes involved with cancer after the surgery in 1997, he could "extrapolate backwards" and determine that the plaintiff had one lymph node involved with cancer in August of 1995 and two to three lymph nodes involved with cancer in February of 1996. He opined that the cancerous lymph nodes discovered in April 1997 appeared to have started in her breasts. However, the cancer in her breast was never

found, which is common with occult cancer. In Dr. Schapira's opinion, plaintiff had cancer in her lymph nodes a year to a year and a half before April of 1997. He testified that in the six-month follow-up, looking at the mammogram, there were one or two cancerous lymph nodes, and 20 months later there were nine cancerous lymph nodes. Dr. Schapira testified that the basis of his opinions was his observation of patients and literature on the growth of breast cancer. However, he could not identify a specific piece of literature. He also testified that since plaintiff's 1997 mammogram revealed that she had nine cancerous lymph nodes, 20 months before that (August 1995) she probably had one cancerous node, and 14 months prior (February 1996), she probably had two to three cancerous lymph nodes. He stated that the basis for this testimony was that the cancer "would not stand still for that period of time." Dr. Schapira testified that there is a reasonable correlation when you look at the size of the tumors and the changes in the size of the tumors over time and the amount of lymph node involvement. Dr. Schapira further testified, "[N]o one knows exactly how many lymph nodes were involved at any particular period of time." He stated, "[Y]ou can look at what happens over time with patients that have primary tumors and how quickly they grow and how many nodes will be involved" and that there is a significant amount of literature regarding patients with primary tumors. However, when concluding his testimony in chambers, he admitted that there is no scientific literature to support his theory concerning the systematic sequence of spread of occult primary breast cancer.

After Dr. Schapira completed his testimony in chambers, Dr. Schapira took the stand, without objection from defendants' counsel, and testified before the jury. During his trial testimony, plaintiff's counsel elicited extrapolation opinions from the doctor over the objections of the defendants. The parties then returned to chambers and Dr. Wiggins' counsel presented an affidavit from Dr. Micetich (the defendants' oncologist and proximate cause expert) and Dr. Rossof's (the plaintiff's oncologist) deposition in support of the defendants' motion *in limine*. At this time, the plaintiff's counsel made a formal objection and argued that he "mistakenly" believed that the *Frye* hearing was not going to be conducted piecemeal and that they were going to complete the *Frye* hearing and receive a ruling before Dr. Schapira took the stand at trial. The court overruled the objection and explained that there were no objections when the matter was first discussed and that all counsel were instructed on how the court would conduct the *Frye* hearing.

Dr. Alfred Torrence was the next witness called by the plaintiff. He opined that Dr. Shaw did not comply with the standard of care after receiving the abnormal mammogram of August 1995. Dr. Tor-

rence testified that Dr. Shaw breached the standard of care because he failed to reach a diagnosis regarding the reason for the plaintiff's enlarged lymph nodes. Dr. Shaw also breached the standard of care by waiting until December of 1996 to refer the plaintiff to a surgeon for a second opinion. He stated that in his opinion, the plaintiff had occult breast cancer in August of 1995, and although occult breast cancer does not make a usual presentation, there were steps that Dr. Shaw could have taken in order to reach a proper diagnosis earlier.

Next, Dr. Wiggins was called by the plaintiff as an adverse witness. During his adverse testimony, Dr. Wiggins agreed that some of plaintiff's lymph nodes had grown twice as large in size between the August 1995 mammogram and the February 1996 mammogram. He did state that in hindsight, the change was significant and did show an abnormal finding. Dr. Wiggins concluded, however, that he did not deviate from the standard of care because it was reasonable for him to rely on the radiology studies and those studies did not indicate that cancer was present at the time he rendered care and treatment to the plaintiff.

Plaintiff then took the stand on her own behalf and testified regarding damages. She also stated that Dr. Shaw never informed her about her enlarged lymph nodes, but that she discovered them herself in December of 1996. She stated that she is fearful that the cancer will reoccur in the future. Plaintiff's daughter, Ms. Studenroth, testified regarding damages as well. She stated that although her mother was once very active, she currently does very little.

Dr. Rossof was the next witness called by the plaintiff, and he testified that there was no accepted method of determining the specific number of lymph nodes that would have been positive at a given time in the past. Dr. Rossof also testified that no study or test exists that can be used to determine the growth rate of lymph nodes or, once the lymph node growth rate is established, to extrapolate backwards to determine how many lymph nodes would be positive at a given time. He testified that this type of study would be "nonsense."

Dr. Jokich, the next witness, testified that Dr. Wiggins deviated from the standard of care by failing to accurately report the changes in plaintiff's mammogram. Dr. Jokich also testified that there was a breach of the standard of care to report that there was no change in the plaintiff's August 1995 mammogram when, in fact, the lymph nodes had increased in size. The plaintiff rested her case.

## THE DEFENDANTS' CASE

The defendants called Dr. Scott Kale (Dr. Shaw's expert), Dr. Mary Beth Leonard (plaintiff's surgeon), Dr. Keith Micetich (Dr. Wiggins'

proximate cause expert) and Dr. Wiggins as witnesses in their case. Dr. Kale, defendants' first witness, testified that Dr. Shaw complied with the standard of care and that it was reasonable for him to rely on the radiology reports, which did not mention malignancy.

After Dr. Kale concluded his testimony, the *Frye* proceedings continued in chambers. During the in-chambers hearing, Dr. Micetich testified in support of the defendants' motion *in limine* to bar Dr. Schapira's testimony. Dr. Micetich testified that he read Dr. Schapira's deposition and that the doctor's method of backward extrapolation was not generally accepted in the medical oncologic or scientific community. Dr. Micetich also testified that there was no literature and that there were no clinical studies or research that looked backwards in a patient with occult breast cancer and calculated the number of cancerous lymph nodes at a given point in time in the past.

When Dr. Micetich concluded his testimony in chambers, the *Frye* hearing was concluded and the court granted the defendants' motion *in limine*. The court reasoned that the plaintiff had not met her burden of proving that her expert's methodology was generally accepted in the scientific community. The court reasoned that it was not the court's role to determine whether a certain methodology is logical or not, but whether that methodology is generally accepted in the relevant scientific community, which in this case is the oncologic community. After the court made its ruling, the plaintiff moved for a mistrial and argued that the *Frye* hearing should not have been conducted in a piecemeal fashion. The court denied plaintiff's motion and reminded plaintiff's counsel that the court advised the parties that it would conduct the *Frye* hearing in a piecemeal manner and that there was no objection from plaintiff's counsel at that time.

When the jury returned to the courtroom, the judge gave the following instruction:

"Ladies and gentlemen, one of the first witnesses we had was Dr. Schapira. Dr. Schapira testified and gave certain testimony as to the number of positive lymph nodes that the plaintiff would have had at earlier times. *** [H]e testified that—generally to the effect that since the plaintiff had nine positive lymph nodes in April of '97, that in his opinion she had two or three positive lymph nodes in 1996, that she would have had one positive lymph node in August of '95, I believe; that he basically had opinions as to the certain specific number of lymph nodes at earlier times, that he could look back in time to say how many lymph nodes he had. You are to disregard that testimony. That testimony is stricken. You're to completely disregard the testimony as to any specific number of positive lymph nodes at earlier times, okay?"

After the judge instructed the jury regarding Dr. Schapira's testimony, Dr. Micetich took the stand and testified that plaintiff's prognosis would have been the same if she was diagnosed in August 1995 or February 1996, and that she would have had the same number of lymph nodes. He also testified that in his opinion plaintiff's cancer would not reoccur.

Dr. Leonard, the next witness, testified that in March of 1997 she performed a fine-needle aspiration, which revealed malignancy, and a biopsy, which indicated that the lymph node looked pathologic. Dr. Leonard then referred the plaintiff to Dr. Rossof, a medical oncologist, for further care and treatment.

The final witness was Dr. Wiggins, and he testified that in his opinion, he exercised the standard of care that any well-qualified radiologist would have exercised when reading the plaintiff's 1996 study. The defendants rested their case, and the court instructed the jury. After the jurors completed their deliberations, they returned a verdict in favor of the defendants. The plaintiff filed a posttrial motion for a judgment notwithstanding the verdict or for a new trial. Both of these motions were denied.

## ANALYSIS

■ The threshold issue we must address in this appeal is whether the plaintiff was denied a fair trial when the defendants' *Frye* objection was raised in a motion *in limine*. The admissibility of evidence is a matter committed to the sound discretion of the trial court, and its decision will not be reversed on review absent a clear abuse of that discretion. *Petre v. Kucich*, 331 Ill. App. 3d 935, 941 (2002), citing *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 92 (1995). Illinois law is clear that the admissibility of expert testimony is governed by the general acceptance test set forth in *Frye*. *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 76-77 (2002), citing *Frye*, 293 F. 1013. The "general acceptance test" provides that scientific evidence is only admissible at trial if the methodology upon which the opinion is based is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014. " '[G]eneral acceptance' does not concern the *ultimate conclusion*. Rather, the proper focus of the general acceptance test is on the *underlying methodology* used to generate the conclusion." (Emphasis added.) *Donaldson*, 199 Ill. 2d at 77.

The position of the parties on appeal is clear. Plaintiff believes that the opinions proffered by her expert, Dr. Schapira, are admissible under the *Frye* test. Conversely, the defendants maintain that plaintiff's expert's backward extrapolation methodology is not gener-

ally accepted in the scientific community. Both parties rely on the Illinois Supreme Court's ruling in *Donaldson* in support of their positions. Applying *Donaldson* and *Frye* to the facts in this case, we find that the backward extrapolation methodology proffered by the plaintiff's expert in this medical malpractice occult breast cancer case is not generally accepted in the scientific community. *Donaldson*, 199 Ill. 2d at 77; *Frye*, 293 F. at 1014.

In *Donaldson*, the court approved the extrapolation method used *in that case* to link the cause of plaintiffs' rare cancer, neuroblastoma, to the deleterious effects of coal tar, because the plaintiffs relied on scientific literature discussing similar, yet not identical, scientific studies and theories. *Donaldson*, 199 Ill. 2d at 85, 88. In *Donaldson*, the court provides a clear explanation of what "general acceptance" may or may not include. The court states that " 'general acceptance' does not concern the ultimate conclusion," but the "underlying methodology," and that "[i]f the underlying method used to generate an expert's opinion is reasonably relied upon by the experts in the field, the fact finder may consider the opinion." *Donaldson*, 199 Ill. 2d at 77. The court also explained that although general acceptance "does not mean 'universal' acceptance," and "does not require *** unanimity, consensus, or even a majority of experts," the expert must still utilize "generally accepted methodology to develop the conclusion," and "[a] technique *** is not 'generally accepted' if it is experimental or of dubious validity." *Donaldson*, 199 Ill. 2d at 77-78. After deciding that the method of extrapolation relied upon by the plaintiffs passed the *Frye* test, the *Donaldson* court reiterated that the methodology must be relied upon by experts in that particular field. *Donaldson*, 199 Ill. 2d at 87-88.

■ Relying on *Donaldson*, plaintiff first assigns error to the trial court's order excluding the doctor's backward extrapolation opinion by arguing that the trial court focused on Dr. Schapira's conclusions rather than his methodology. We disagree. The trial record is clear that the trial court specifically addressed this issue in its ruling after the *Frye* hearing, when it stated that its ruling was not based upon whether it agreed with Dr. Schapira's conclusions but that its ruling was based upon whether it agreed with Dr. Schapira's methodology. The trial court also stated that based upon Dr. Schapira's testimony and the testimony of Dr. Rossof and Dr. Micetich, the methodology of backward extrapolation in occult breast cancer patients was not generally accepted. In fact, in *Donaldson*, the court specifically noted that "all of plaintiffs' experts testified that they utilized the method of extrapolation, and that the technique is generally accepted in their fields." 199 Ill. 2d at 87-88. Conversely, here, the plaintiff's doctors did

not testify that they utilized a backward extrapolation methodology or that Dr. Schapira's method of backward extrapolation was generally accepted in the oncologic community. In fact, the testimony of Dr. Schapira, the plaintiff's only causation expert, failed to establish that the methodology of backward extrapolation in occult breast cancer patients is generally accepted. We find, after reviewing this record, that backward extrapolation in occult breast cancer cases is a methodology which is only used by the plaintiff's expert.

Plaintiff's insistence that this case falls within the purview of the rules delineated by the *Donaldson* court is misplaced. While the extrapolation methodology was approved when used to determine what caused the cancer in the *Donaldson* plaintiffs, that does not mandate that this court must find that the extrapolation methodology is acceptable in every case. See *Kane v. Motorola, Inc.*, 335 Ill. App. 3d 214 (2002) (courts may reject an expert's conclusions when his extrapolation methodologies are unsound or when the scientific data upon which they rely is not related to the conclusion reached). Dr. Schapira admits that his methods are not only new, but that there is no support in the literature or from any other oncologists regarding this methodology. Therefore, applying *Donaldson* and *Frye* to the facts in this case, we cannot conclude that the trial court abused its discretion when it determined that Dr. Schapira's backward extrapolation methodology was not generally accepted in the scientific community. *Donaldson*, 199 Ill. 2d at 77; *Frye*, 293 F. at 1014.

■ Plaintiff's second argument on appeal is that she was denied a fair trial because the defendants' *Frye* objection was raised in a motion *in limine* and the trial court did not have adequate time to conduct a hearing prior to the commencement of Dr. Schapira's testimony. Essentially the plaintiff is arguing that the defendants' *Frye* objection should not have been brought in a motion *in limine* and that it was untimely. Motions *in limine* are addressed to the trial court's inherent power to admit or exclude evidence; generally, a reviewing court will not disturb the trial court's ruling on motions *in limine* absent an abuse of discretion, so long as the trial court exercises its discretion within the bounds of the law. *Beehn v. Eppard*, 321 Ill. App. 3d 677, 680-81 (2001), citing *People v. Williams*, 188 Ill. 2d 365, 369 (1999). An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view (*People v. Illgen*, 145 Ill. 2d 353, 364 (1991); *Diamond v. United Food & Commercial Workers Union Local 881*, 329 Ill. App. 3d 519, 526 (2002)), or if there is an application of impermissible legal criteria. *Boatmen's National Bank of Belleville v. Martin*, 155 Ill. 2d 305, 314 (1993). However, a reviewing court can sustain the decision

of the trial court to admit or exclude evidence for any appropriate reason, regardless of whether the trial court relied on that reason or whether the trial court's reasoning was correct. See *Leonardi*, 168 Ill. 2d at 97; *Government Employees Insurance Co. v. Buford*, 338 Ill. App. 3d 448, 456 (2003).

First, the plaintiff asserts that the motion *in limine* was really a dispositive motion and relies on *Silverstein v. Brander*, 317 Ill. App. 3d 1000 (2000), and *Peterson v. Randhava*, 313 Ill. App. 3d 1 (2000), in support of her position. The facts in *Silverstein* and *Peterson* are distinguishable from the facts in the case at bar. In *Silverstein*, the defendant filed a motion *in limine* and sought to bar the plaintiff's expert's opinion testimony and, once the motion *in limine* was granted, the defendant made an oral motion for summary judgment which was granted after it was put in writing. *Silverstein*, 317 Ill. App. 3d at 1005. In *Peterson*, the trial court *sua sponte* converted the defendant's motion for sanctions into a motion for summary judgment. *Peterson*, 313 Ill. App. 3d at 9. The facts in *Silverstein* and *Peterson* are different from the facts in this case. In this case, both parties presented pretrial motions, including motions *in limine*, before the trial and each side had an opportunity to raise objections during a pretrial hearing. In addition, the trial court did not convert the defendants' motion *in limine* into a motion for summary judgment, did not bar all the plaintiff's expert's opinion testimony or enter a judgment for the defendants, as was done in *Silverstein* and *Peterson*. Here, the trial court only barred that portion of the plaintiff's expert's testimony regarding backward extrapolation. We are surprised that the plaintiff is now arguing that the trial court abused its discretion, thereby entitling her to a new trial, when Dr. Schapira was still allowed to testify regarding causation and, most importantly, that if the plaintiff's occult breast cancer had been diagnosed earlier, preventive measures could have been implemented sooner.

Second, with regard to the *Frye* objections being presented in a motion *in limine*, we find that this practice has not been held improper by this court. See *Petre*, 331 Ill. App. 3d at 945 (*Frye* evidentiary hearing conducted where motion *in limine* brought); *People v. Taylor*, 335 Ill. App. 3d 965, 967 (2002) (*Frye* motion presented as motion *in limine*). We agree with the courts in *Petre* and *Taylor* that *Frye* objections are properly raised in motions *in limine*. See *Petre*, 331 Ill. App. 3d at 945; *Taylor*, 335 Ill. App. 3d at 967. We find that the trial court's ruling was not arbitrary or unreasonable and did not involve the application of impermissible legal criteria. Therefore, we find that the trial court did not abuse its discretion or deny the plaintiff a fair trial when it permitted the defendants to raise a *Frye* objection in a motion

*in limine* or when it struck the plaintiff's expert's backward extrapolation testimony.

Based upon the foregoing, the jury verdict in favor of the defendants is affirmed.

Affirmed.

O'BRIEN and GALLAGHER, JJ., concur.