PAMELA BOSCO, Indiv. and as Ex'r of the Estate of Peter Bosco, Deceased, Plaintiff-Appellant, v. ROBERT JANOWITZ *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 1—07—0617

Opinion filed February 10, 2009.

Law Offices of Kenneth C. Chessick, of Schaumburg (Kenneth C. Chessick, of counsel), and Novoselsky Law Offices, of Chicago (David A. Novoselsky and Leslie J. Rosen, of counsel), for appellant.

Pretzel & Stouffer Chtrd., of Chicago (Robert Marc Chemers, Edward H. Nielsen, Belle L. Katubig, and Scott L. Howie, of counsel), for appellees Robert Janowitz and Westmont Family Practice, S.C.

Bollinger, Ruberry & Garvey, of Chicago (Scott C. Bentivenga, James E. Abbott, Michael S. Haggerty, and Krista R. Frick, of counsel), for other appellees.

JUSTICE CUNNINGHAM delivered the opinion of the court:

Following a jury verdict in favor of the defendants in a medical malpractice case, the plaintiff filed a posttrial motion for judgment notwithstanding the verdict and a request for a new trial on all issues. On February 27, 2008, the circuit court of Cook County denied the plaintiff's motion, holding that the jury's decision was fully supported by the evidence. On appeal, the plaintiff argues that: (1) a judgment notwithstanding the verdict or a new trial on all issues was warranted; (2) the trial court abused its discretion in admitting irrelevant and highly prejudicial evidence against the plaintiff; and (3) the trial court abused its discretion in admitting evidence of other physicians' negligence, and in instructing the jury with the long forms of the Illinois Pattern Jury Instructions, Civil, Nos. 12.04 and 12.05 (2000). For the following reasons, we affirm.

## BACKGROUND

Peter Bosco (Bosco) battled a series of long, complicated gastroin-

testinal illnesses before succumbing to colon cancer on May 17, 2002, at the age of 37. In March 1993, Bosco began experiencing symptoms of cramps, diarrhea and abdominal pain. He visited his family physician, Dr. Robert Janowitz (Dr. Janowitz), at Westmont Family Practice, S.C. Dr. Janowitz conducted a stool sample test, which tested negative for infection, and prescribed medicine to Bosco to relieve the symptoms. Within two days of this visit, Bosco reported that his symptoms had resolved. However, on May 13, 1993, he returned to Dr. Janowitz, complaining of the same symptoms, along with a fever and a feeling of weakness. Dr. Janowitz sent Bosco to the emergency department of a hospital (ER) for intravenous (IV) fluids to prevent further dehydration. Blood tests revealed a low hemoglobin level of 9.4. Bosco was informed of these test results.

On June 14, 1993, Bosco returned to Dr. Janowitz for more blood tests. Bosco reported no pain or symptoms. However, the results of his blood tests showed an increased hemoglobin level of 11.1, but Dr. Janowitz still considered Bosco to be anemic. Three days later, Bosco reported "vague epigastric fullness" to Dr. Janowitz, who then ordered an upper gastrointestinal (G.I.) series test and an ultrasound. Dr. Janowitz advised both Bosco and his wife, Pam Bosco, of the normal test results on June 23, 1993, and instructed Bosco to return to Dr. Janowitz's office for a follow-up on July 12, 1993.

On June 28, 1993, Bosco reported to Dr. Janowitz that his G.I. symptoms had returned and had been recurring for the past three days. In response, Dr. Janowitz referred him to see Dr. Philip Sweeney (Dr. Sweeney), a gastroenterologist.

On June 29, 1993, Bosco made his first visit to Dr. Sweeney, where he presented with symptoms of diarrhea, abdominal cramps, weight loss and anemia. Dr. Sweeney performed a full physical examination, which revealed blood in the stool. A diagnostic colonoscopy was scheduled for the following day.

Dr. Sweeney performed the colonoscopy on Bosco the next day, during which a single polyp was identified and removed from Bosco's ascending colon. The removed polyp was diagnosed as a tubular adenoma, a specific type of benign polyp. The results of the colonoscopy enabled Dr. Sweeney to diagnose Bosco with ulcerative colitis, a chronic condition that required lifelong management. Subsequently, Dr. Sweeney prescribed steroid medications to reduce inflammation and iron pills for anemia. Bosco was instructed to return to Dr. Sweeney within two to three weeks.

After Dr. Sweeney's diagnosis, Bosco sought a second opinion at the Mayo Clinic in Minnesota. The Mayo Clinic confirmed that Bosco had ulcerative colitis, but did not advise Bosco that a cancer surveillance plan was necessary at that time.

In August 1993, Bosco was hospitalized for two days as a result of an ulcerative colitis flare-up, experiencing symptoms of recurrent vomiting and upper abdominal pain. Both Dr. Janowitz and Dr. Sweeney examined Bosco at the hospital. Dr. Janowitz conducted a basic physical examination on Bosco, while Dr. Sweeney ordered an "upper GI exam with a small bowel follow through." Because Bosco believed that some of his pain stemmed from an infection secondary to his work environment, he did not consent to the procedure that Dr. Sweeney recommended.

A month after his discharge from the hospital, Bosco called Dr. Janowitz to report that he was feeling better and that he would follow up with Dr. Sweeney. Bosco also contacted Dr. Sweeney by telephone in October 1993 to say that he was feeling well, at which time Dr. Sweeney instructed him to follow up in the office in six to eight weeks. However, on November 5, 1993, Bosco experienced another flare-up, and as a result, Dr. Sweeney increased his medication and instructed Bosco to return in three weeks for reevaluation. Bosco never returned to Dr. Sweeney.

In 1995, due to changes in his health insurance, Bosco switched his primary care physician from Dr. Janowitz to Dr. Edward Mc-Menamin (Dr. McMenamin). On October 3, 1995, Bosco was again hospitalized with complaints of diarrhea and skin rash. Dr. Mc-Menamin performed a history and physical examination and blood tests, which revealed that Bosco's hemoglobin level was at a severely low level of 5.5. Dr. McMenamin requested a consultation with Dr. Gregorio Orbeta (Dr. Orbeta), a gastroenterologist.

During the October 3, 1995, hospitalization, Dr. Orbeta examined Bosco, performed a flexible sigmoidoscopy examination, and prescribed oral medications to alleviate his symptoms. Dr. Orbeta's plan was to also perform a diagnostic colonoscopy examination, but to do so at a later date when Bosco was no longer bleeding, since the colon was more susceptible to perforation during periods of flare-ups. Dr. Orbeta advised Bosco of the symptoms, medications, possible complications and the necessity for Bosco to be examined once a year.

On October 13, 1995, Bosco made a follow-up visit to Dr. Orbeta's office. Subsequently, on October 20, 1995, Dr. Orbeta performed the scheduled diagnostic colonoscopy examination. During the procedure, Dr. Orbeta took photographs and three biopsies of the transverse colon, but did not find any polyps. Dr. Orbeta noted that the "entire colonic mucosa showed edema, hyperemia, multiple ulcerations, and multiple pseudopolyp formations." His findings were consistent with ulcerative colitis, with no evidence of malignancy. Dr. Orbeta reported these findings to Bosco by telephone on October 24, 1995, at which time Bosco reported that he was feeling better.

Sometime in 1996, Bosco changed his primary care physician from Dr. McMenamin back to Dr. Janowitz, but kept Dr. Orbeta as his gastrointestinal specialist. On November 14, 1996, Bosco treated with Dr. Orbeta and reported that he was doing well and not experiencing any pain. The ulcerative colitis was under control with medication.

On June 7, 1997, Bosco visited Dr. Janowitz's office for urinary problems, which were resolved shortly after the visit. However, on June 30, 1997, Bosco called Dr. Orbeta and complained of blood in his semen, although his ulcerative colitis was otherwise asymptomatic. Dr. Orbeta referred Bosco to a urologist.

Bosco did not treat with Dr. Orbeta again until May 8, 1998, at which time he reported that the ulcerative colitis was still asymptomatic and under control with medication. Dr. Orbeta noted that Bosco had a "normal exam" and "no bleeding."

On September 10, 1998, Bosco made a final visit to Dr. Janowitz's office for the purpose of having a "pre-adoption" physical because he and his wife wanted to adopt a child. At this visit, Bosco informed Dr. Janowitz that his condition was under control and that he was asymptomatic.

On May 17, 1999, Bosco visited Dr. Orbeta's office for the last time. He reported that he had no bleeding, occasional cramps, and was otherwise asymptomatic. Dr. Orbeta did a complete blood analysis as one had not been done since 1995. A few days later, Dr. Orbeta telephoned Bosco about the results of the blood test and informed him of a low hemoglobin level. Dr. Orbeta instructed Bosco to take iron pills and to return to the office for a follow-up blood evaluation in one month. Bosco went to Dr. Orbeta's office on July 8, 1999, to pick up an order for a repeat blood test, but he never returned to Dr. Orbeta for the follow-up visit, despite instructions to do so.

Bosco sought no treatment from any physician from May 17, 1999, until October 1999, when he visited another gastroenterologist, Dr. Joseph Brasco (Dr. Brasco), for a second opinion regarding his condition. On October 19, 1999, Bosco was admitted to the ER at Northwest Community Hospital with complaints of abdominal pain. Dr. Brasco saw Bosco at the hospital, where several X-rays were taken. Shortly thereafter, Dr. Brasco discharged Bosco from the hospital.

On October 25, 1999, Bosco was readmitted to the ER for severe abdominal pain. Dr. Brasco then performed a colonoscopy and diagnosed an obstruction in the colon. Unknown to Dr. Brasco at the time, he had perforated Bosco's colon during the procedure. Bosco was subsequently rushed into emergency surgery.

Dr. Robert Aki (Dr. Aki) performed emergency surgery on Bosco after the colon perforation and removed three-quarters of the colon

after discovering the presence of stage 2 cancer. Dr. Aki informed Bosco's wife that he had removed all of the cancer during the surgery.

Following the surgery, Bosco was referred to Dr. Al Benson (Dr. Benson), an oncologist at Northwestern Memorial Hospital. On January 17, 2000, Bosco had his first visit with Dr. Benson, who advised him that stage 2 cancer was a "good" stage and that the cancer could be treated and cured. Subsequently, Bosco began chemotherapy treatments.

On September 7, 2000, Dr. Aki again performed surgery on Bosco to remove the remaining one-quarter of his colon. It was during this surgery that Dr. Aki discovered that Bosco's colon cancer had spread to his abdomen. The metastatic cancer would eventually spread to the spleen, liver, pelvis and neck. Bosco died on May 17, 2002.

On September 6, 2002, Bosco's wife, Pam Bosco, individually and as the executor of Bosco's estate, filed a medical malpractice lawsuit against Dr. Brasco, Northwest Community Hospital, Dr. Janowitz, Westmont Family Practice, S.C., Dr. Gregorio Orbeta, Jr., and Gregorio R. Orbeta, Jr., M.D., S.C.[1] On October 3, 2006, a jury trial commenced at which the plaintiff and defendants presented the testimony of several expert witnesses.

At trial, Dr. Richard Corlin (Dr. Corlin), a gastroenterologist, testified on behalf of the plaintiff. He testified that patients with ulcerative colitis and polyps, as in Bosco's situation, have an exceedingly high risk of developing colon cancer. He testified that because Bosco's colon had the presence of both polyps and ulcerative colitis, two indicia for cancer development, Dr. Orbeta should have taken biopsies from the entire colon, rather than only the transverse colon. To a reasonable degree of medical certainty, Dr. Corlin testified that both Dr. Janowitz and Dr. Orbeta breached the standard of care by failing to create a colon cancer detection plan, failing to communicate the plan to Bosco, and failing to execute a colon cancer detection plan. These omissions, he opined, caused and contributed to the development of metastatic colon cancer and Bosco's death.

The plaintiff also presented the expert testimony of Dr. Patrick Sullivan (Dr. Sullivan), who specialized in internal medicine. Dr. Sullivan testified that even when a primary care physician refers a patient to a specialist, the primary care physician is still responsible for coordinating the patient's care. Dr. Sullivan opined that the primary care physician "has to find out what is going on with the patient,

---

[1]Prior to trial, Dr. Brasco and Northwest Community Hospital settled with the plaintiff, and were dismissed with prejudice from the lawsuit. Thus, they are not parties before this court on appeal.

what's the diagnosis, what's the problem." He testified that in his own practice, his responsibility did not end once he referred a patient to a specialist because the primary care doctor is "the doctor that the patient will turn to for questions." In Dr. Sullivan's opinion, Dr. Janowitz breached the standard of care by not creating a colon cancer detection plan, by failing to communicate such a plan to Bosco, and by failing to execute such a detection plan. It was Dr. Sullivan's opinion that by failing to have a cancer detection plan, which would have included annual exams such as testing stools for occult blood, blood tests, and liver function tests, Dr. Janowitz caused and contributed to the development and spread of Bosco's colon cancer, which ultimately led to his death. Dr. Sullivan further testified that had stool testing or a colonoscopy been done in 1998, Bosco's colon cancer would have been detected at that time.

Doctors Janowitz, Orbeta, Eisenstein and Barrett testified on behalf of the defense. Dr. Janowitz testified that the standard of care for a primary care physician between 1993 and 1999 did not require the physician to advise a patient of all risks and complications relating to his disease, when the patient's condition was being treated by a specialist. Rather, the primary care physician's role was to try to get the patient treated by a physician who could best deal with the patient's problem. Dr. Janowitz testified that once Bosco was diagnosed with ulcerative colitis, it was his plan to have Bosco continue to be followed by his gastroenterologist, Dr. Sweeney. He stated that the reason he did not discuss the risks and long-term issues of ulcerative colitis with Bosco was because "I refer [patients] to the doctor who can do the best for them to treat that problem the best. And that's why I sent him to Dr. Sweeney, so that Dr. Sweeney would use more knowledge of that problem and could give Mr. Bosco [all] of the information that [he] needed about [his] particular problem that I couldn't." Dr. Janowitz stated that he further communicated such a plan to Bosco by continually referring him to Dr. Sweeney, who was a gastroenterologist, for evaluation and treatment of his ulcerative colitis.

Dr. Steve Eisenstein (Dr. Eisenstein), a board-certified family practice physician, testified on behalf of Dr. Janowitz. He testified that, to a reasonable degree of medical certainty, Dr. Janowitz complied with the standard of care, and Dr. Janowitz's treatment did not cause injury to Bosco. Specifically, Dr. Eisenstein opined that after Dr. Janowitz's referral to Dr. Sweeney and Dr. Sweeney's subsequent diagnosis, Dr. Sweeney became the primary treater for Bosco's ulcerative colitis. He opined that a gastroenterologist was the appropriate physician to make management decisions about Bosco's condition—such as explain

treatment options, treat the patient, formulate plans and recommend follow-ups. Further, Dr. Eisenstein stated that the physician with the most knowledge and experience regarding the disease should be the one making treatment decisions. He also testified that a family physician, who is less familiar with a complicated illness, may give mixed messages or confuse possible issues relating to the illness and, thus, Dr. Sweeney was Bosco's main source of information regarding his ulcerative colitis. Dr. Eisenstein further testified that the standard of care did not require Dr. Janowitz to do a complete physical examination on Bosco in 1998 when Bosco requested a "pre-adoption physical" for the purpose of adopting a child. The standard of care also did not require Dr. Janowitz to do annual rectal examinations on patients with ulcerative colitis whose condition was being treated and managed by a gastroenterologist. Dr. Eisenstein also testified that Dr. Janowitz was not required to recommend or advise Bosco to have annual colonoscopies following his diagnosis of the ulcerative colitis, because those procedures were performed at the discretion of a gastroenterologist. Also, the standard of care did not require Dr. Janowitz to advise Bosco about the risks of colon cancer after Bosco was diagnosed with ulcerative colitis, because a gastroenterologist was the one who could provide the most accurate statistics, treatment and information about the risks of colon cancer as related to ulcerative colitis.

Dr. Orbeta also testified that the standard of care regarding colon cancer surveillance for patients with ulcerative colitis was that surveillance should begin eight years after the initial diagnosis. The basis of his opinion stemmed from guidelines set by three major gastroenterology societies in the United States. Bosco's initial diagnosis of ulcerative colitis occurred in 1993, and according to the standard of care enunciated by Dr. Orbeta, colon cancer surveillance for Bosco was not required until 2001. Dr. Orbeta further testified that the standard of care for a diagnostic colonoscopy only required biopsies to be done in a representative area of the colon, rather than throughout the entire colon. He also testified that during their first meeting, he had discussed with Bosco information about the disease, its course, etiology, symptoms, risks of cancer, the need for follow-up, annual office visits, and the need for surveillance colonoscopies eight years after the initial diagnosis.

In support of Dr. Orbeta's testimony, Dr. Terrence Barrett (Dr. Barrett) testified that the single polyp that Dr. Sweeney removed during Bosco's colonoscopy in 1993 was a "diminutive polyp" that was typically insignificant for a patient with ulcerative colitis. He opined that the standard of care did not require Dr. Orbeta to begin a colon cancer detection plan for Bosco until 8 to 10 years "after the first bout

of a severe episode of pancolitis," which would have been in the year 2001 in this case. Further, Dr. Barrett testified that Dr. Orbeta complied with the standard of care by taking three biopsies from the transverse colon because it was a diagnostic colonoscopy, not a cancer surveillance colonoscopy. Because no polyps were found during Dr. Orbeta's diagnostic colonoscopy on Bosco in 1995, there was no reason for Dr. Orbeta to suspect that Bosco had cancer. Dr. Barrett also opined that Dr. Orbeta complied with the standard of care with respect to his treatment plan for Bosco's anemia and low hemoglobin levels, and properly communicated such plan to Bosco.

On October 16, 2006, the jury rendered a unanimous verdict in favor of the defendants. Subsequently, on January 16, 2007, the plaintiff filed a posttrial motion requesting that the trial court grant her a judgment notwithstanding the verdict or a new trial on all issues. On February 28, 2007, the trial court denied the motion, holding that the jury's decision was fully supported by the evidence.

On March 6, 2007, the plaintiff filed a notice of appeal before this court.

## ANALYSIS

We determine the following three issues: (1) whether a judgment notwithstanding the verdict or a new trial on all the issues is warranted; (2) whether the trial court was within its discretion in admitting evidence that Bosco failed to follow up with his physician; and (3) whether the trial court properly gave the long-form instruction to the jury concerning the sole proximate cause issue.

We first address the issue of whether the plaintiff is entitled to judgment notwithstanding the verdict or a new trial on all issues. The plaintiff argues that she is entitled to judgment notwithstanding the verdict on the liability issue, based on the fact that the evidence overwhelmingly showed that the defendants breached the standard of care when they failed to create a cancer detection plan, communicate such a plan to Bosco, and execute the plan. Alternatively, the plaintiff argues that the judgment should be set aside and a new trial on all the issues should be granted because the judgment for the defendants was contrary to the weight of the evidence and substantial justice was not accomplished in this case. We disagree.

A judgment notwithstanding the verdict is reviewed *de novo* and should be granted only when "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967); *York v. Rush-Presbyterian-St.Luke's Medical Cen-*

*ter*, 222 Ill. 2d 147, 178, 854 N.E.2d 635, 652 (2006). The threshold for a judgment notwithstanding the verdict is high, and a motion for such will only be successful when all of the evidence, together with all reasonable inferences considered in favor of the nonmovant, point to a "total failure or lack of evidence" to prove the nonmovant's case. *York*, 222 Ill. 2d at 178, 854 N.E.2d at 652. For that reason, a judgment notwithstanding the verdict is improper if " 'reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented.' " *York*, 222 Ill. 2d at 178, 854 N.E.2d at 652, quoting *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351, 654 N.E.2d 1365, 1374 (1995). Specifically, in medical malpractice actions, the *Pedrick* standard requires the reviewing court to scrutinize all of the evidence submitted by the plaintiff. *Mielke v. Condell Memorial Hospital*, 124 Ill. App. 3d 42, 48, 463 N.E.2d 216, 222 (1984). Using expert testimony, the plaintiff must establish the standard of care by which to measure the physicians' conduct, and prove, through affirmative evidence, that the defendants were negligent and that the negligence proximately caused injury to the plaintiff. *Schmitz v. Binette*, 368 Ill. App. 3d 447, 452-53, 857 N.E.2d 846, 851 (2006), citing *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 423, 328 N.E.2d 301, 304-05 (1975). However, "[w]here the parties offer conflicting medical testimony regarding the applicable standard of care and [the] defendant's breach of that standard, the jury is uniquely qualified to resolve the conflict," and a judgment notwithstanding the verdict is inappropriate. *Swaw v. Klompien*, 168 Ill. App. 3d 705, 711, 522 N.E.2d 1267, 1271 (1988).

■ In the case at bar, the plaintiff specifically argues that the defendants failed to provide evidence to support the verdict in their favor. She contends that the record did not establish that Dr. Janowitz could reasonably rely on Dr. Orbeta to carry out Dr. Janowitz's duty to create, communicate and execute a colon cancer detection plan. The plaintiff argues that Dr. Orbeta had no memory of ever creating, communicating or executing a colon cancer detection plan and, thus, breached the standard of care in treating Bosco.

We disagree with the plaintiff's argument that the defense failed to present evidence to support the jury's verdict. A review of the record indicates that when all of the evidence, including expert testimony, is considered with all reasonable inferences in favor of the defendants, the plaintiff is not able to meet the high standard that warrants awarding her a judgment notwithstanding the verdict. At trial, Dr. Janowitz and Dr. Eisenstein both testified that the standard of care for primary care physicians did not require a primary care physician to advise a patient, whose ulcerative colitis was already being treated and managed by a gastroenterologist, of all the risks and complications of the

disease. The jury also heard expert testimony that the standard of care from 1993 to 1998, the time during which Bosco treated with Dr. Janowitz, did not require Dr. Janowitz to create, communicate or execute a cancer detection plan. While the plaintiff's experts, Dr. Corlin and Dr. Sullivan, testified to the contrary, resolution of such conflicting opinions was squarely within the province of the jury. *York*, 222 Ill. 2d at 178, 854 N.E.2d at 652 ("[a] court of review 'should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way' "), quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53, 603 N.E.2d 508, 512 (1992). We find that the defense presented sufficient evidence to enable the jury to find that Dr. Janowitz did not breach the standard of care for a primary care physician.

Likewise, the jury heard sufficient evidence to find that Dr. Orbeta complied with the standard of care for a reasonably well-qualified gastroenterologist. Doctors Orbeta and Barrett presented testimony that Dr. Orbeta did not breach the standard of care from 1995 to 1999 during his treatment of Bosco's ulcerative colitis. Specifically, Dr. Orbeta testified that colon cancer surveillance for Bosco was not required under the then-existing standard of care until eight years after the initial diagnosis. Because Dr. Sweeney diagnosed Bosco with ulcerative colitis in 1993, Dr. Orbeta testified that cancer surveillance would not have been required until 2001, and Bosco was no longer a patient of Dr. Orbeta in 2001. Similarly, Dr. Barrett supported Dr. Orbeta in testifying that based on the recommendation of the major gastroenterology societies in the United States, the standard of care did not require Dr. Orbeta to begin any colon cancer surveillance with Bosco until 8 to 10 years after "the first bout of a severe episode of pancolitis." He also testified that because the procedure was only a diagnostic colonoscopy, Dr. Orbeta complied with the standard of care by taking three biopsies from the transverse colon. Again, while the plaintiff offered competing expert testimony regarding the standard of care as applied to Dr. Orbeta, the jury, as fact finder, was uniquely qualified to resolve any conflicting medical testimony and to subsequently find that neither Dr. Janowitz nor Dr. Orbeta breached the standard of care. We hold that the record before us shows sufficient evidence to support the jury's finding that Dr. Orbeta did not breach the standard of care for a reasonably well-qualified gastroenterologist.

Therefore, the plaintiff has not established the necessary threshold to warrant a judgment notwithstanding the verdict. All of the evidence, together with all the reasonable inferences considered in favor of the defendants, does not show a "total failure or lack of evidence" to

prove the defendants' case. In fact, the record shows that the defendants presented sufficient evidence, including the testimony of several experts in response to the plaintiff's theories. That evidence provided a sufficient basis for the jury to reject the plaintiff's theories and find for the defendants.

In the alternative, the plaintiff requests that this court set aside the judgment for the defendants and order a new trial. She argues that the evidence presented at trial was more than sufficient to show that substantial justice was not done in this case. We find the plaintiff's contention without merit.

The standard which we must apply regarding the trial court's decision to deny the plaintiff's motion for a new trial is abuse of discretion. *York*, 222 Ill. 2d at 179, 854 N.E.2d at 653. A new trial is granted only "if the verdict is contrary to the manifest weight of the evidence." *Mizowek v. De Franco*, 64 Ill. 2d 303, 310, 356 N.E.2d 32, 36 (1976). A verdict is contrary to the manifest weight of the evidence "when the opposite conclusion is clearly evident or when the jury's findings prove to be unreasonable, arbitrary and not based upon any of the evidence." *York*, 222 Ill. 2d at 179, 854 N.E.2d at 653-54. To determine whether the trial court abused its discretion, we must consider "whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial." *Maple*, 151 Ill. 2d at 455-56, 603 N.E.2d at 513. Further, in denying a motion for a new trial, the trial judge " ' "has the benefit of his previous observation of the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility." ' [Citation.]" *Maple*, 151 Ill. 2d at 456, 603 N.E.2d at 513.

Here, we cannot say that the jury's verdict in favor of the defendants was unreasonable, arbitrary, or unsupported by evidence so that an opposite conclusion is clearly evident. As outlined above, the defendants presented evidence including the testimony of several experts regarding the proper standard of care by which the physicians who treated Bosco from 1993 to 1999 should be judged. The jury heard evidence that the defendants did not breach the standard of care in treating Bosco and, as a result, did not proximately contribute to or cause his death. While the jury also heard the plaintiff's theories and heard those experts testify that the defendants breached the standard of care, the jury was free to weigh the evidence and judge the credibility of the witnesses presented. *Moore v. Anchor Organization for Health Maintenance*, 284 Ill. App. 3d 874, 880, 672 N.E.2d 826, 832 (1996) ("it is the function of the jury to weigh contradictory evidence, judge the credibility of witnesses, and draw ultimate conclusions as to the facts of a case"). Thus, we are not "at liberty to substitute [our]

judgment for that of the [jury] merely because different conclusions might be drawn from the evidence presented at trial." *Moore*, 284 Ill. App. 3d at 880, 672 N.E.2d at 832. It was within the province of the jury, as finder of fact, to listen to the competing expert testimony, weigh the evidence presented, determine the credibility of all the witnesses, and determine whose testimony to accept or reject. See *Lisowski v. MacNeal Memorial Hospital Ass'n*, 381 Ill. App. 3d 275, 282-83, 885 N.E.2d 1120, 1130 (2008).

In denying the plaintiff's motion for a new trial, in this case, the trial court held that the jury's verdict was supported by the evidence presented:

"You [heard] them tell you that—tell all of us that they gave higher marks to witnesses who had appeared on behalf of the defendants than they did for witnesses who appeared on behalf of the plaintiff. And you [heard] them tell us that they weighed all of that evidence and they believed that the plaintiff's claims that these defendants had violated standards of practice were wanting, that the plaintiff did not meet the standards, the burden of proof that was applicable to the plaintiff on that issue.

They did exactly what we asked them to do when we call jurors in, weigh the evidence and based upon the evidence, decide whether there is a case for liability or not, and they found the case for liability wanting."

We find that the trial court did not abuse its discretion in denying the plaintiff's motion for a new trial because the jury's verdict in favor of the defendants was supported by the evidence. The plaintiff was not denied a fair trial since she was also afforded the opportunity to present evidence including expert testimony in support of her position. Thus, we hold that the plaintiff is not entitled to a new trial on this basis.

We next determine the issue of whether the trial court was within its discretion when it admitted evidence that Bosco failed to follow up with Dr. Orbeta after May 17, 1999. The plaintiff argues that a new trial is warranted because the admission of such evidence was prejudicial to the plaintiff. Specifically, the plaintiff contends that this evidence was erroneously admitted because the defendants had abandoned this "affirmative defense" when they failed to tender instructions to the jury that would have permitted the jury to apply the evidence to the issues presented.

As stated above, a reviewing court will not reverse a trial court's ruling on a motion for a new trial unless it is affirmatively shown that the trial court clearly abused its discretion. *Maple*, 151 Ill. 2d at 455, 603 N.E.2d at 513. "Generally, a party is not entitled to reversal based

upon evidentiary rulings unless the error was substantially prejudicial and affected the outcome of the case." *Taluzek v. Illinois Central Gulf R.R. Co.*, 255 Ill. App. 3d 72, 83, 626 N.E.2d 1367, 1376 (1993). The discretion as to whether evidence is admitted is given to the trial court, and such determination will not be overturned on appeal unless there is clearly an abuse of discretion. *Taluzek*, 255 Ill. App. 3d at 83, 626 N.E.2d at 1376. The party seeking reversal bears the burden of establishing prejudice. *Smith v. Baker's Feed & Grain, Inc.*, 213 Ill. App. 3d 950, 952-53, 572 N.E.2d 430, 432 (1991).

In this case, the defendants contend that the evidence regarding Bosco's failure to follow up with Dr. Orbeta was properly admitted as evidence to rebut the plaintiff's *prima facie* case. They argue that it shows that the defendants were unable to do what the plaintiff and her experts claimed the defendants should have done to treat Bosco's condition. We find this argument persuasive.

Here, the evidence that Bosco failed to return to Dr. Orbeta's office for a follow-up evaluation, despite being instructed to do so, did not constitute prejudicial evidence that should have been excluded. Instead, it was evidence used to rebut the plaintiff's *prima facie* case, as the defendants had a right to do. One of the plaintiff's chief complaints against Dr. Orbeta was that he failed to comply with the standard of care because he should have performed a colonoscopy after May 17, 1999, if colon cancer was the suspected culprit of Bosco's health problems at that time. Dr. Orbeta testified that he had informed Bosco by telephone after the May 17, 1999, blood results that Bosco needed to come back in one month for reevaluation. It was undisputed that Bosco never returned to see Dr. Orbeta. Such evidence was highly relevant and goes to the issue of whether Dr. Orbeta could even have complied with the standard of care which the plaintiff claims he breached. Essentially, Bosco's failure to return to see Dr. Orbeta and to consent to treatment prevented Dr. Orbeta from further examining Bosco and performing any other necessary medical procedures. Even had Dr. Orbeta created a colon cancer surveillance plan and communicated that plan to Bosco, as the plaintiff urges he should have done, Bosco's failure to follow up with Dr. Orbeta was rebuttal evidence to establish that Dr. Orbeta could not possibly have executed that plan. See *Agnew v. Shaw*, 355 Ill. App. 3d 981, 990-91, 823 N.E.2d 1046, 1054 (2005) ("a reviewing court can sustain the decision of the trial court to admit or exclude evidence for any appropriate reason, regardless of whether the trial court relied on that reason or whether the trial court's reasoning was correct").

Also, the admission of the evidence complained of by the plaintiff did not affect the outcome of the case. The jury heard several experts

testify that the defendants did not breach the standard of care in treating Bosco. The result reached by the jury was clearly warranted by all of the other evidence presented, regardless of whether evidence of Bosco's failure to return to Dr. Orbeta for follow-up was erroneously admitted into evidence. *Smith*, 213 Ill. App. 3d at 952, 572 N.E.2d at 432 (" '[A]n erroneous ruling on evidence is harmless where the result reached was not affected by the ruling, and the result reached was the only one warranted by other evidence in the case' "), quoting *Atkins v. Thapedi*, 166 Ill. App. 3d 471, 477, 519 N.E.2d 1073, 1077 (1988).

The plaintiff has failed to carry her burden of proof regarding the prejudicial effect of the admitted evidence. We hold that the trial court did not abuse its discretion in admitting that evidence. Because of this holding, we need not address the plaintiff's argument that the defendants abandoned the evidence as an affirmative defense when they failed to tender jury instructions that would have permitted the jury to apply that evidence to the issues.

■ Lastly, we consider the issue of whether the trial court erred in giving the long-form instructions to the jury concerning the sole proximate cause issue related to Bosco's death. The plaintiff argues that she is entitled to a new trial because the jury was irrevocably tainted when the trial court denied her motion *in limine* and her request to give a specific version of the jury instructions that did not include sole proximate cause language.

A review of the record discloses that the plaintiff's motion *in limine* regarding this issue is absent from the record submitted to this court. The record contains a transcript of the trial court denying the motion. That transcript states in pertinent part:

"Regarding number 20 [motion *in limine*] and any evidence with respect to the negligence of third parties, certainly under the *Reidy* [*sic*] case, which came down in August of this year, it's clear that any settling defendants may be part of consideration by a jury in attributing fault to various defendants, and therefore, negligence concerning third parties would certainly be something that the jury would be allowed to consider. So as a blanket consideration, this would be denied.

It's further denied concerning developing of the defendant's theory as to whether or not certain things needed to be done by the defendants or whether they were following similar practices of others that the plaintiff was seeing at the time. So number 20 is denied."

We defer to the trial court's reasoning for denying the plaintiff's motion *in limine*. Because the motion *in limine* itself is absent from

the record, we are limited to resolving any doubts arising from an incomplete record against the plaintiff and, consequently, assume that the trial court's ruling was correct. 155 Ill. 2d R. 328; *Muellman-Cohen v. Brak*, 361 Ill. App. 3d 52, 54, 836 N.E.2d 678, 679 (2005), citing *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392, 459 N.E.2d 958, 959 (1984).

Subsequently, the trial court instructed the jury with the long forms of Illinois Pattern Jury Instructions, Civil, Nos. 12.04 and 12.05 (2000) (IPI), which included sole proximate cause language. The trial court reasoned:

"I believe that if the jury concludes that the—it is more probably true than not true that the negligence of Dr. Brasco was the sole proximate cause of the spread of the cancer and the death of Mr. Bosco then it would be appropriate to use the sole proximate cause instruction. That is something that they could conclude from the evidence. And, therefore, it's appropriate to give the sole proximate cause instruction over the objection of the plaintiff.

If the jury believes that the cancer was contained as of October 1999 and if the colon had been removed in toto at that point that Mr. Bosco would not have developed cancer further then the proximate cause of the spread of the cancer would be as a result of the perforation of the colon and the subsequent spread of the cancer as a result of the actions of Dr. Brasco.

They certainly could conclude that from the evidence but it's up to them to reach that conclusion, it's not for me to say one way or the other. But since they could reach that conclusion it would be appropriate to give the instruction to allow the defendants to make that argument to the jury."

The long form of IPI Civil (2000) No. 12.04 is appropriately given to the jury when there is admitted evidence that the sole proximate cause of the resulting injury could have been the negligent conduct of a dismissed defendant. *Petre v. Kucich*, 356 Ill. App. 3d 57, 66, 824 N.E.2d 1117, 1125 (2005). Likewise, the long form of the IPI Civil (2000) No. 12.05 is proper since " '[a] defendant has the right not only to rebut the evidence tending to show that [the] defendant's acts are negligent and the proximate cause of claimed injuries, but also has the right to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of [the] plaintiff's injuries.' " *Mack v. Anderson*, 371 Ill. App. 3d 36, 57, 861 N.E.2d 280, 300 (2006), quoting *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 101, 658 N.E.2d 450, 459 (1995); see also *Brax v. Kennedy*, 363 Ill. App. 3d 343, 351, 841 N.E.2d 137, 144 (2005).

In this case, the defendants argue that the evidence presented to the jury was sufficient to allow the trial court to give the long-form

instructions which included the proximate cause language complained of by the plaintiff. The jury heard evidence that allowed it to conclude that the conduct of Dr. Brasco was the sole proximate cause of Bosco's metastatic cancer and death. Doctor Corlin, the plaintiff's own expert, testified that Dr. Brasco's perforation of the colon caused the metastatic spread of the cancer and that the failure of Dr. Aki to remove the entire colon soon after Bosco's partial colectomy increased the risk that the cancer would recur. He also testified that Bosco's stage 2 cancer in October 1999 was treatable and curable. Bosco's oncologist, Dr. Benson, also testified that leaving the partial colon behind increased the risk of recurring colon cancer. The jury also heard testimony from Dr. Sullivan, who testified that had the surgery been done in a timely fashion and the cancer taken out prior to its spread, Bosco likely would have enjoyed an average life expectancy. Finally, the jury also heard evidence that at the time Dr. Brasco perforated Bosco's colon and Dr. Aki removed Bosco's colon, neither Dr. Janowitz nor Dr. Orbeta was involved in Bosco's treatment. It was undisputed that Bosco's final visits to Dr. Janowitz and Dr. Orbeta were on September 10, 1998, and May 17, 1999, respectively.

We hold that the trial court did not abuse its discretion in instructing the jury with the long forms of IPI Civil (2000) Nos. 12.04 and 12.05, in light of the fact that the jury could have concluded from the evidence that Dr. Brasco's conduct was the sole proximate cause of Bosco's metastatic cancer and eventual death. Accordingly, the plaintiff is not entitled to a new trial based on this theory.

We need not address the plaintiff's argument that the trial court misapplied *Ready v. United/Goedecke Services*, 367 Ill. App. 3d 272, 854 N.E.2d 758 (2006), *aff'd in part & rev'd in part*, 232 Ill. 2d 369 (2008), because apportionment rules are inapplicable where, as here, the defendants were found not liable.

As a final matter, we note that there is some merit to the defendants' contention that the plaintiff forfeited certain arguments on appeal by failing to provide legal authority or cite to the record in violation of Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)); nonetheless, these failures to comply with Rule 341 have had no effect on this appeal.

Affirmed.

KARNEZIS, P.J., and HOFFMAN, J., concur.